DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Defendant-Appellant Charles F. Bucalo has appealed from the decision of the Medina County Court of Common Pleas, Domestic Relations Division, that designated and distributed property and debt, awarded spousal support, and found that he committed financial misconduct. We affirm in part and reverse in part.
 I {¶ 2} On July 24, 2003, Plaintiff-Appellee Dawn Caprice Bucalo ("Wife") filed a complaint for divorce against Defendant-Appellant Charles F. Bucalo ("Husband"). Husband filed an answer and a counterclaim for divorce on August 19, 2003.
 {¶ 3} On May 11, 2004, a hearing was held and the trial court granted the parties a divorce on the grounds of incompatibility. The trial court found the term of the marriage to be from September 30, 1995 to May 11, 2004.[1]
 {¶ 4} In the July 31, 2004 journal entry granting the divorce, the trial court also determined property and support awards. The trial court found that Husband spent a great amount of time and money day trading on the internet and that he admitted to using the $17,666 Wife inherited from her grandmother, which was her separate property, as part of his day trading funds. He also admitted that Wife had asked him to put the money in long term and safe investments. The trial court also found that Husband was in complete control of the couple's finances and all accounts were in his name only. While Husband claimed to have separate accounts and funds, the trial court found that he did not meet his burden of proof in tracing his separate property claims. The trial court determined that all "the assets and funds in the possession of the parties [were] deemed marital property subject to division." The trial court's finding included the couple's three vehicles. The trial court also found that the couple's marital home was marital property subject to division.
 {¶ 5} Wife agreed to allow Husband to retain his retirement assets free and clear from any claims by her, but she argued that she should retain her entire IRA as compensation for Husband's financial misconduct in dissipating her inheritance. The trial court found that Wife should retain $17,666 of her retirement account to compensate her for Husband's financial misconduct. The trial court also determined that Wife should retain the same amount as Husband did in his own retirement account, $13,384. As a result the remaining $17,379 of Wife's 401(K) was to be divided equally by the parties.
 {¶ 6} The trial court found that the mortgage and three credit card debts were marital debts and were to be paid from the proceeds of the sale of the marital residence. The trial court determined that a significant portion of the debt was incurred by Wife during the pendency of the divorce as she tried to pay the marital expenses with no contribution from Husband.
 {¶ 7} In regards to spousal support, the trial court found that Wife's income for the calculation of spousal support was $74,011. The trial court stated that Husband conceded that he is capable of supporting himself, but he chooses not to and would prefer to continue to receive the $1,500 per month spousal support from Wife. The trial court found Husband "voluntarily under-employed." However, because no evidence was presented as to what Husband previously earned or what he was capable of earning, the trial court could not impute Husband with income for the calculation of spousal support. Accordingly, the trial court set a hearing to determine what amount Husband would be imputed with for calculation purposes.
 {¶ 8} After the hearing on Husband's prior and potential income, the trial court determined that Husband should be imputed with an annual income of $41,751.30. The trial court averaged Husband's annual income from the last three years of his full time employment. The trial court then ordered that Wife pay Husband $350 per month as spousal support "for a period of twelve months or until the earlier occurrence of the death of either party, the remarriage or cohabitation of the Husband."
 {¶ 9} Husband's original appeal to this Court from his divorce proceedings was dismissed for lack of a final, appealable order. This Court granted Husband leave to re-file his appeal after the Qualified Domestic Relations Order ("QDRO") had been completed and filed. Once the QDRO was properly filed, Husband has re-filed his appeal asserting five assignments of error.
 II Assignment of Error Number One
"THE TRIAL COURT ERRED IN FINDING THAT THE HUSBAND DID NOT MEET HIS BURDEN OF PROOF IN TRACING HIS SEPARATE PROPERTY CLAIMS."
 {¶ 10} In his first assignment of error, Husband has argued that the trial court erred in finding that he did not trace his separate property. Specifically, Husband has argued that he established that his separate property was used to purchase the GMC Sonoma, the 1994 Ford Ranger, and to make a downpayment on the martial residence. We disagree.
 {¶ 11} The distribution of assets in divorce proceedings is governed by R.C. 3105.171. Pursuant to the statute, the trial court is required to determine whether property is marital or separate property. R.C.3105.171(B). Separate property includes, but is not limited to, real or personal property which was acquired by one spouse prior to the date of marriage. R.C. 3105.171(A)(6)(a)(ii).
 {¶ 12} This Court must affirm the trial court's determination as to the nature of the property as either marital or separate if such determination is supported by competent, credible evidence. Barkley v.Barkley (1997), 119 Ohio App.3d 155, 159; see, also, Boreman v.Boreman, 9th Dist. No. 01CA0034, 2002-Ohio-2320, at ¶ 7. This standard of review "is highly deferential and even `some' evidence is sufficient to sustain the judgment and prevent a reversal." Barkley,119 Ohio App.3d at 159. As the trial court is best able to observe the demeanor, gestures, and voice inflections of the witnesses, and to use those observations to weigh the credibility of the proffered testimony, this Court is guided by a presumption that the findings of the trial court are correct. Id., citing In re Jane Doe 1 (1991), 57 Ohio St.3d 135.
 {¶ 13} Husband has claimed that the money used to buy two of the cars and part of the down payment on the marital home was from his pre-marital separate property. Pursuant to R.C. 3105.171(A)(6)(b), "[t]he commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." "The party seeking to have the commingled property deemed separate has the burden of proof, by a preponderance of the evidence, to trace the asset to his or her separate property." West v. West, 9th Dist. No. 01CA0045, 2002-Ohio-1118, ¶ 27;Modon v. Modon (1996), 115 Ohio App.3d 810, 815, appeal not allowed (1997), 78 Ohio St.3d 1442. Accordingly, traceability is the issue when determining whether separate property remains separate property once it has been commingled with marital property. Wheeler v. Wheeler (Dec. 12, 2001), 9th Dist. No. 3188-M, at 6.
 {¶ 14} Wife testified to the following at trial. The couple owned three vehicles: 1) a GMC Sonoma, titled to Husband, paid off, and worth about $500; 2) a Ford Ranger, titled to Wife, paid off, used by Husband, and worth about $1,500; and 3) a Dodge Durango, titled to Wife, with a loan balance of $10,000. Wife agreed to award Husband the Ranger and Sonoma, as long as she received proper credit for them.
 {¶ 15} After reviewing Husband's testimony and presentation of exhibits concerning the tracing of his alleged separate monetary property, this Court finds it prudent to summarize the transactions rather than recite Husband's lengthy testimony. On November 11, 1996, over a year after the marriage, Husband cashed out his 401(K) and received $15,006.42. He rolled the funds over into a Putnam IRA, which was in his name alone. Husband testified that as of December 4, 1997 the value of the rolled over Putnam IRA was $15,274.58; a spreadsheet Husband created listed $13,519.29 of the IRA as Husband's money and $1,755.29 as Wife's money. A Putnam Investments statement identified by Husband and dated November 24, 1997 reflected the account value as $17,452.87. On December 11, 1997, Husband cashed out the Putnam IRA and deposited it into a Charter One checking account in Husband and Wife's names; the relevant bank statement showed a $15,274.58 deposit from the IRA wire transfer. On December 12, 1997, Husband opened an account with Edward Jones and deposited $20,000 from the joint checking account into the joint Edward Jones account. Husband testified that the money from the check was from his 401(K) cash out and his settlement award. As of January 1, 1998, after Husband submitted the check to Edward Jones, the Charter One account showed a balance of $4,652.26. Six days later Husband closed the Edward Jones account and deposited the funds into a Charter One savings account. Husband then withdrew $4,060 from the checking account to purchase the GMC Sonoma.
 {¶ 16} On January 15, 1998, Husband withdrew $4,750 from the savings account to purchase the Ford Ranger; Husband testified that that money came from his 401(K) cash out and his settlement award. On March 27, 1998, Husband withdrew $12,000 from the savings account and deposited it into the checking account. Husband testified that the only remaining funds in the savings account were from his 401(K) cash out and his accident award. Husband then withdrew that money and used it to pay part of the mortgage. Husband testified that that money was "strictly" from his 401(K) and settlement award. Husband testified that $9,650 of his own personal money from his 401(K) and settlement award went into the purchase of the marital home.
 {¶ 17} Husband's testimony revealed the following regarding the tracing of his settlement award from his car accident. On December 31, 1995, Husband's account with Everen Securities contained $10,140.60, which Husband testified was his settlement from a pre-marital car accident. On May 16, 1996, Husband liquidated the account and on May 31, 1996 he deposited the funds into the Charter One checking account. In July of 1996 Husband transferred $10,000 into an Edward Jones account, which listed both Husband and Wife on the account. In October 1996, Husband closed that account and received two checks from Edward Jones. On October 11, 1996, Husband deposited the checks into the Charter One checking account. On October 30, 1996, Husband bought the LeSabre. Husband presented copies of two checks to Wittenmyer's Westward Auto and testified that he purchased the 1996 LeSabre with the recently deposited money from the Edward Jones investments; the checks totaled $9,730.75. Husband testified that the funds used were from his settlement award. Husband testified that he also obtained a $5,000 loan to purchase the LeSabre. On December 3, 1997, Husband sold the LeSabre for $8,847.10 and satisfaction of the loan and the proceeds were deposited into the Charter One checking account. On December 11, 1997, Husband tendered a check from the checking account for $20,000 and opened another Edward Jones account in both parties' names.[2] The remainder of Husband's testimony regarding the tracing of his settlement award mirrors his testimony regarding the tracing of his 401(K) funds.
 {¶ 18} Husband admitted that not all of the 401(K) money was non-marital money. Husband testified that the amounts used on the house and other home purchases were non-marital and whatever was left was marital. Husband agreed that all of the couple's earned money went into the Charter One checking account and it was used to pay household bills. Husband testified that the money for household bills was "earmarked" by him and that way he knew which money was his non-marital money and which was marital. Husband agreed with Wife's counsel that the checks paid from the Charter One checking account to Edward Jones for investments were put into joint accounts for Husband and Wife. Husband testified that he "earmarked" the money for the house out of his pre-marital money even though it came out of the Charter One checking account that contained Wife's paycheck and was used for household bills.
 {¶ 19} After reviewing the lengthy testimony and numerous exhibits relevant to this assignment of error, this Court cannot find that the trial court erred in determining that Husband failed to trace his alleged separate property. While we agree that Husband entered the marriage with separate funds from his 401(K) and the settlement award from his car accident, we cannot find that he has traced said funds by a preponderance of the evidence. The evidence shows that Husband deposited his separate funds into the joint checking account. Said checking account was used to pay household bills and both parties' employment checks were deposited into the account. Accordingly, not only was Husband using the accounts for investments, but funds were also being deposited and withdrawn for undisputed marital purposes. Also, the Edward Jones account was a joint account and Husband admitted that he used martial money to fix the LeSabre before selling it and to pay the loan on the vehicle. We are not persuaded by Husband's testimony that he "earmarked" his separate money and that he was able to keep track of the money from his 401(K) and settlement award after he deposited it into the joint checking account. Not only do we find such a theory unreasonable and unlikely, Husband failed to demonstrate how he "earmarked" the funds. He did not satisfy his burden by relying on his theory that he knew what money was his and used that money rather than the marital money in the joint account; he needed to demonstrate by a preponderance of the evidence that, although commingled with martial funds, his separate funds retained their separate identity. The evidence before this Court leads us to conclude that Husband did not trace his separate pre-marital funds once they were commingled with marital funds in the marital accounts.
 {¶ 20} Based on the foregoing, we find that the trial court's determination that the money used to buy the GMC Sonoma and the Ford Ranger and the money used as a down-payment on the marital residence were martial property; we find that competent, credible evidence supported the trial court's decision. Accordingly, Husband's first assignment of error lacks merit.
 Assignment of Error Number Two
"THE TRIAL COURT ERRED IN FINDING THE HUSBAND'S INVESTING A PORTION OF THE WIFE'S INHERITANCE CONSTITUTES FINANCIAL MISCONDUCT."
 {¶ 21} In his second assignment of error, Husband has argued that the trial court erred in finding that he committed financial misconduct. Specifically, Husband has argued that the trial court's finding that his investing Wife's inheritance constituted financial misconduct was not supported by the record. We agree.
 {¶ 22} This Court reviews a finding of financial misconduct under the manifest weight of the evidence standard. Kita v. Kita (Nov. 24, 1999), 9th Dist. No. 19256, at 10. When evaluating whether a judgment is against the manifest weight of the evidence in a civil context, the standard of review is the same as that in the criminal context. Frederick v. Born
(Aug. 21, 1996), 9th Dist. No. 95CA006286, at 14. In determining whether a criminal conviction is against he manifest weight of the evidence:
"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weights heavily against the conviction." (Quotation omitted). State v. Thompkins (1997),78 Ohio St.3d 380, 387.
 {¶ 23} Pursuant to R.C. 3105.171(E)(3), "[i]f a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property." "`Financial misconduct' implies some type of wrongdoing such as interference with the other spouse's property rights." Kita at 4, citing Hammond v. Brown (Sep. 14, 1995), 8th Dist. No. 67268, 1995 WL 546903. The burden of proving financial misconduct is on the complaining party. Gallo v. Gallo, 11th Dist. No. 2000-L-208, 2002-Ohio-2815, at ¶ 43.
 {¶ 24} A review of Ohio appellate case law reveals that unsuccessful marital investments and allegations of financial misconduct go hand in hand. In Jacobs v. Jacobs, the Fourth Appellate District addressed the issue of financial misconduct and erratic stock trading and poor investments. Jacobs v. Jacobs, 4th Dist. No. 02CA2846, 2003-Ohio-3466. After stating that R.C. 3105.171(E)(3) should only apply when a spouse engages in some type of "wrongdoing[,]" the court found that "[t]here must be a clear showing that the offending spouse either profited from the alleged misconduct or intentionally defeated the other spouse's distribution of assets." Jacobs at ¶ 23, citing Wideman v. Wideman, 6th Dist. No. WD-02-30, 2003-Ohio-1858, at ¶ 34. The court then noted "that investing, even poor investing, is neither wrongdoing nor financial misconduct and [they would] not construe the statute so broadly as to include investment mistakes." Id. at ¶ 23. In finding that the husband did not engage in financial misconduct the court determined that there was no evidence that the investment losses were purposely incurred and that by every indication, the husband suffered just as much loss as the wife; therefore, the wife failed to meet her burden and husband could not be found guilty of financial misconduct. In declining to find financial misconduct for "risky investments," the Sixth Appellate District also began its analysis with the finding that financial misconduct must be based on "wrongdoing." Mikhail v. Mikhail, 6th Dist. No. L-03-1195,2005-Ohio-322, at ¶ 28. In describing the wrongdoing, the court stated that "[t]ypically, the offending spouse * * * either profit[s] from the misconduct or intentionally defeat[s] the other spouse's distribution of marital assets." Id. at ¶ 28, citing Hammond, supra. The Mikhail Court concluded that financial misconduct allegations based on investment activity require "some showing of wrongdoing or interference with the offended spouse's property rights before a showing of financial misconduct can be predicated on a party's investment strategy." Mikhail
at ¶ 32. The court also found that while spouses do have some fiduciary responsibility toward each other, "to hold spouses accountable to each other under a prudent investor standard is * * * simply unworkable in the context of a divorce proceeding." Id.
 {¶ 25} The Third Appellate District also found that "[b]efore a compensating award is made * * * there must be a clear showing that the offending spouse either profited from the alleged misconduct or intentionally defeated the other spouse's distribution of assets." (Citation omitted). Eggeman v. Eggeman, 3d Dist. No. 2-04-06, 2004-Ohio 6050, at ¶ 24. In Eggeman, the court found that the purpose of "R.C.3105.171(E)(3) is to neutralize losses caused by the offending spouse's conduct and not to simply reward one spouse for the other's wrongdoing when no loss in value has occurred." Id. at ¶ 26. The court then found that while the husband did engage in financial misconduct, the distributive award to the wife was not warranted because the record failed to show that the husband personally gained or profited from his misconduct or that the wife's interest was defeated. Id. at ¶ 25.
 {¶ 26} In the instant matter, Wife testified at trial that Husband controlled all the finances and whenever she inquired about them he would become "extremely irate." The more questions she asked the more "irate he became." Wife's income was directly deposited into Husband's checking account; she received a pay stub that documented the amount, but Husband would "lose it" if she opened the envelope containing the pay stub. Many of the computer files concerning the couple's finances were password protected and Wife could not access them. When Wife asked why she could not see any information on their finances Husband told her she was bad at handling money and that he wanted to handle it. Wife knew Husband was day trading, but she "didn't know to what extent." After she filed for divorce, Wife learned that Husband was trading "hundreds or thousands of dollars * * * at a time, tens of thousands a day sometimes."
 {¶ 27} In 1999, Wife inherited an annuity from her grandmother worth $17,666.43. Husband "insisted" Wife cash in the annuity, deposit it into his checking account, and allow him to invest it for her. After receiving the payment, Wife agreed but only if Husband invested the money in bonds or other safe investments, with no risk at all; Husband told Wife that is what he would do with the money. During the divorce proceedings, Wife learned from Husband that he lost the money on the stock market and that it was all gone. Wife did not know if Husband was telling the truth, but she knew the money was gone. Wife had no control over the money once she gave it to Husband.
 {¶ 28} Husband testified to the following regarding Wife's inheritance. Husband lost the money trading it on his Ameritrade account. At one point Husband had $40,000 in the Ameritrade account and at the time of hearing there was only $3,114 left. Husband stated that Wife never told him to invest the inheritance in bonds, she only said she wanted it "safe and to make the most appreciation possible." Husband traded the inheritance in the same manner he did the rest of their money. He claimed that he told Wife he was trading it on Ameritrade and that he told her when he lost the money. Husband denied not telling Wife about losing her inheritance until after she filed for divorce. Husband testified that he did not "earmark" her inheritance money in the Ameritrade account, he just invested it. Husband testified that he invested about $12,000 of Wife's inheritance because she used $4,000 for eye surgery.
 {¶ 29} Given the facts of the instant matter and the relevant law, including that of our sister courts we find that the trial court lost its way and created a manifest miscarriage of justice when it determined that Husband committed financial misconduct. We find that under the evidence before this Court, Wife has not met her burden of proof. The evidence showed that Husband invested Wife's inheritance in his Ameritrade account, where he also invested martial assets. Wife testified that she asked Husband to place the money in bonds and Husband testified that she only asked that it be placed in safe investments; it is undisputed that Wife did not want her money placed in high risk investments. The evidence did not show that Husband stole the money from Wife; that Husband intentionally lost the money; that Wife wanted the money kept separate from the marital money; that Husband dealt with the money in a different way than the couple's other investments; that he placed the money in high risk or unsafe investments; or that Husband profited from the loss of the money. Rather the evidence showed that Husband was not skilled in investing and consistently lost money, including marital money.
 {¶ 30} We recognize that Husband not only engaged in unsuccessful investments, but also failed to heed Wife's request that her inheritance be placed in safe and long term investments. However, we find that although Husband's behavior was clearly irresponsible, bordering on dishonesty, his actions do not rise to the level of financial misconduct as provided in R.C. 3105.171(E)(5). Financial misconduct requires more than dishonest behavior. We join our sister districts and find that financial misconduct requires a wrongdoing that interferes with a spouse's property rights and results in profit to the wrongdoer from the alleged misconduct or stems from an intentional act meant to defeat the other spouse's distribution of assets. See Jacobs, Mikhail, and Eggeman
supra. As the Fourth Appellate District has found, we cannot hold that poor investing constitutes financial misconduct. See Jacobs supra. To find financial misconduct a court must look to the reasons behind the questioned activity or the results of the activity and determine whether the wrongdoer profited from the activity or intentionally dissipated, destroyed, concealed, or fraudulently disposed of the other spouse's assets. After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we find that the evidence before this Court does not support a finding of financial misconduct. Accordingly, we find that the trial erred in finding that Husband's investment of Wife's inheritance constituted financial misconduct.
 {¶ 31} Husband's second assignment of error has merit.
 Assignment of Error Number Three
"THE TRIAL COURT ERRED IN FINDING THAT THE DEBTS INCURRED BY THE WIFE AFTER THE PARTIES SEPARATED WERE MARITAL DEBTS."
 {¶ 32} In his third assignment of error, Husband has argued that the trial court erred in finding that the credit card debt incurred by Wife after the separation was martial debt. Specifically, Husband has argued that the evidence established that the debt was a result of Wife's personal purchases and charges, not marital expenses. We agree in part.
 {¶ 33} As discussed in Husband's first assignment of error, this Court reviews a trial court's classification of property, including debt, for some competent, credible evidence to support the trial court's conclusion. See Jagusch v. Jagusch, 9th Dist. No. 02CA0036-M, 2003-Ohio-243, at ¶ 28. Again, this Court is guided by a presumption that the findings of the trial court are correct. Barkley,119 Ohio App.3d at 159, citing In re Jane Doe 1 (1991),57 Ohio St.3d 135.
 {¶ 34} Relevant to the issue of marital debt, Wife testified that immediately after she filed for divorce she started paying all of the household bills. She soon discovered that there were more bills to pay than money to cover them. Wife was approximately $1,500 short every month. When Husband was ordered to leave the marital home, Wife was ordered to pay $1,000 per month as temporary spousal support which made paying the bills even more difficult. At the time of the divorce, Wife had two credit cards-a Chase MasterCard and a Discover card. Around the time Wife filed for divorce the MasterCard had a balance of $254.79; nine months later the balance rose to $4,775.17. Wife stated that the increase was caused by replacing things Husband took with him when he left, buying new clothing, and household maintenance costs. Wife admitted that she charged $500 on the MasterCard for attorney's fees. The balance on the Discover at the time Wife filed for divorce was $1,500.82 and the balance on March 25, 2004 was $9,315.31. Wife testified that the increase in charges on the Discover card was from clothing, the purchase of a used vehicle because the car Wife had was unreliable, and vehicle maintenance. Wife stated that there was nothing on the Discover card that was not an ordinary household expense. After the divorce, Wife took out a $5,000 personal loan from Bank One to cover expenses due in between pay days, such as Husband's spousal support and household bills. Wife admitted that $2,500 of the loan was used to pay her attorney's fees and was not a martial obligation.
 {¶ 35} The trial court found the following debt to be marital debt: 1) Mortgage Loan of $90,543; 2) Discover credit card balance of $9,315.31; 3) Chase credit card balance of $4,775.17; and a Bank One loan balance of $4,398.19. We find competent, credible evidence to support the trial court's finding that the mortgage and Discover credit card balances should be considered marital debt. The record supports the trial court's finding that the Discover card debt was the result of martial purchases and payments; while Wife did admit to purchasing clothes and a new vehicle, said purchases were properly determined to be marital, household purchases during the course of the marriage. However, this Court finds error in the trial court's inclusion of Wife's attorney's fees as marital debt. Wife admitted that she charged $500 to the Chase MasterCard for attorney's fees and the evidence shows that the amount is included in the marital debt determined by the trial court. The trial court found that each party was required to pay his/her own attorney's fees, therefore this Court finds that the trial court erred when it included the $500 in the martial debt on the Chase MasterCard. The trial court also erred when, after Wife admitted $2,500 of the Bank One loan was used to pay her attorney's fees and after it determined such fees were not a marital obligation, it included such fees as marital debt. Given that the trial court found each party was responsible for their own attorney's fees, we cannot reconcile the inconsistencies of the trial court's decision.
 {¶ 36} Based on the foregoing, we find that the trial court erred in including the $500 Wife charged on the Chase MasterCard as martial debt and the $2,500 Wife used for attorney's fees from the Bank One loan as marital debt. Such a decision was not based on competent, credible evidence and was inconsistent with the trial court's finding that each party was responsible for their own attorney's fees. However, as we previously stated, we also find that the trial court's determination that the balances of the mortgage and the Discover credit card were marital debt was based on competent, credible evidence.
 {¶ 37} Accordingly, we find merit in part of Husband's third assignment of error.
 Assignment of Error Number Four
"THE TRIAL COURT ERRED IN ITS DIVISION OF PROPERTY."
 {¶ 38} In his fourth assignment of error, Husband has argued that the trial court erred in its division of property. Specifically, Husband has argued that based on his first three assignments of error, the property distribution by the trial court constitutes error. We agree in part.
 {¶ 39} In divorce proceedings, the trial court must divide marital property in an equitable manner. R.C. 3105.171(C)(1). A trial court is vested with broad discretion when fashioning this division of property.Bisker v. Bisker (1994), 69 Ohio St.3d 608, 609. Accordingly, absent an abuse of discretion, a trial court's division of marital property will be upheld by a reviewing court. West v. West, 9th Dist. No. 01CA0045, 2002-Ohio-1118, at ¶ 37. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court.Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621.
 {¶ 40} Based on our disposition of Husband's first three assignments of error we find that the trial court did not abuse its discretion in relation to the distribution of the GMC Sonoma, the Ford Ranger, or the requested credit for the down-payment on the marital home. However, given our disposition of assignment of error number two we do find that the trial court abused its discretion in granting Wife credit for the $17,666 Husband invested for Wife. As previously discussed this Court does not find that Husband's activities constituted financial misconduct and therefore, Wife was not entitled to a distribution award and the trial court's award of one was unreasonable. We also find that the trial court abused its discretion by including $3,000 in Wife's attorney's fees as marital debt; as such that portion of the trial court's distribution of marital debt was arbitrary.
 {¶ 41} Accordingly, we find merit in part of Husband's fourth assignment of error.
 Assignment of Error Number Five
"THE TRIAL COURT ERRED IN FAILING TO AWARD REASONABLE SPOUSAL SUPPORT TO THE HUSBAND FOR A REASONABLE PERIOD."
 {¶ 42} In his fifth and final assignment of error, Husband has argued that the trial court erred in its award of spousal support. Specifically, Husband has argued that the evidence does not support the finding that he was voluntarily under-employed or the average annual income calculated by the trial court. We disagree.
 {¶ 43} It is well settled that the trial court is vested with broad discretion over matters of spousal support. Poitinger v. Poitinger, 9th Dist. No. 22240, 2005-Ohio-2680, at ¶ 7. As a result, this Court will not disturb a trial court's decision regarding spousal support obligations absent an abuse of discretion. Pauly v. Pauly (1997),80 Ohio St.3d 386, 390, citing Booth v. Booth (1989), 44 Ohio St.3d 142,144. As previously discussed, an abuse of discretion implies the trial court's attitude was unreasonable, arbitrary, or unconscionable.Blakemore, 5 Ohio St.3d at 219.
 {¶ 44} When determining spousal support, the trial court must make a factual determination as to the income of each spouse. R.C.3105.18(C)(1)(a). The trial court must also consider the income earning potential of each spouse. R.C. 3105.18(C)(1)(b). Such determinations are findings of fact, and this Court will not reverse the trial court's findings of fact if the findings are supported by some competent, credible evidence in the record. Jaroch v. Madalin, 9th Dist. No. 21681,2004-Ohio-1982, at ¶ 8, quoting Huff v. Huff, 9th Dist. No. 20934, 2003-Ohio-1304, at ¶ 22.
 {¶ 45} Husband's argument that the trial court erred in its spousal support award is two-fold: 1) the trial court erred in determining that Husband was voluntarily under-employed and 2) the trial court erred in imputing Husband's average annual income. We will first address the finding of Husband being voluntarily under-employed.
 Voluntarily Under-employed {¶ 46} In Koch v. Koch, 9th Dist. No. 03CA00111-M, 2004-Ohio-7192, this Court considered whether a husband was voluntarily under-employed for purposes of the spousal support calculation. We noted that when determining spousal support R.C. 3105.18(C)(1) requires a court to consider the "income" of each spouse. Koch at ¶ 20. Unlike the child support statute, R.C. 3119.01(C)(5),[3] the spousal support statute, R.C. 3105.18 does not provide a definition of income. However, in Koch
this Court found that R.C. 3105.18 includes consideration of whether a spouse is voluntarily under-employed. Id. Specifically, R.C.3105.18(C)(1)(a) and (b) provide that when determining the support amount a court shall consider not only the income of the parties, but also the "relative earning abilities of the parties[.]" R.C. 3105.18(C)(1)(b). Relative earning ability of a spouse mirrors the language in R.C.3119.01(C)(5) which requires a consideration of the potential income of the parent. Accordingly, we find that like the child support statute, the spousal support statute requires a court to determine not only the actual income of the spouse, but also whether said income is appropriate given the spouse's earning ability. Such a determination is a finding of fact to be reviewed for some competent, credible evidence. See Jaroch supra.
 {¶ 47} In the instant matter, after hearing testimony on the issue, the trial court found that Husband was voluntarily under-employed and imputed his income for purposes of the spousal support calculation. Accordingly, we must review the testimony for competent, credible evidence of Husband's voluntary under-employment.
 {¶ 48} Wife testified to the following concerning Husband's employment history and ability. The last time Husband had a job was in 2000 at BFI. After he lost his job, Husband "sat on the couch for a long time." He then started his own business, Charles Consolidated LLC, and worked there through 2003. Wife did not know what Husband was making then and when she asked how the company was doing he told her the company was doing well and he was seeing new customers every day. Wife was supporting Husband after he lost his employment at BFI and while he ran his own business. Wife later learned that Husband's business was making very little profit, with only "3 or $4,000 in the last year."
 {¶ 49} Wife testified that Husband is capable of maintaining employment. He has a Bachelor of Science Degree in Business Administration. Wife believed Husband's business could be successful if he chose to work, but he prefers to play Nintendo and watch TV. After Husband stopped working at BFI he began building an addition on the marital home; Wife presented several pictures showing Husband doing manual labor building the addition onto the home during the spring and summer of 2002. Wife did not believe Husband had any trouble with his back while he was working on the addition. Wife did not observe any physical manifestation of an injury in Husband that would keep him from working, especially since his prior employment was not physical.
 {¶ 50} Wife testified on cross-examination that Husband was involved in a "fender bender" in 1992 and received Workers Compensation following the injury; Husband spent ten years seeing various doctors about his back pain and he has taken prescription drugs for the pain.
 {¶ 51} Husband testified to the following concerning his income. Husband's 2003 tax return showed that he made $3,773 that year. He could not remember how much he made in 2002 and he thought he made between six and seven thousand in 2001. In the three years he has run his business he has collected 31 clients and never made more than $3,773. Husband admitted that if Wife were not paying him spousal support he would not be able to run his business the same way. If Husband was not receiving spousal support he could obtain employment and still run his business. He conceded that he has a college degree and marketable skills, but he had no plans to seek employment because he wanted to keep running his business. Husband admitted that he wanted Wife to pay his spousal support so he could continue to run his business.
 {¶ 52} Husband testified that from 1991-1996 he worked for BFI Ferris Trucking, from 1996-1998 he worked for Ameriwaste, and from 1998-2000 he again worked for BFI. After being downsized from BFI, Husband stated he sought employment through job fairs and directly contacting pharmaceutical companies about potential sales oriented employment. Having no success in finding employment, Husband started his own waste brokerage company.
 {¶ 53} Kenneth Kavalchek ("Kavalchek") testified to the following on the behalf of Husband. Kavalchek has been friends with Husband for about 17 years; the two would help each other with house projects and car maintenance. Kavalchek found that some days Husband could work fine and other days his back pain would keep him in bed. Kavalchek witnessed Husband's back problems and his treatment of prescription drugs. He also noticed that over the past year Husband has become "pretty depressed."
 {¶ 54} On cross-examination Kavalchek testified that Husband is able to work and he has witnessed him lifting objects and climbing ladders.
 {¶ 55} John Bucalo ("brother"), Husband's brother, testified to the following. Brother is Husband's attorney on his ongoing workers' compensation case. Husband can do manual work, but then spends time on his back recovering from the work. Husband has been living with brother since October 2003, so brother was able to witness the problems Husband has with his back.
 {¶ 56} After reviewing the evidence presented to the trial court regarding Husband's work history and employment ability, we find that there was competent, credible evidence that Husband was voluntarily under-employed. The record showed that Husband had a college degree, had previously maintained full-time employment, and was capable of maintaining full-time employment. The testimony also revealed that Husband choose to start his own company and that in three years the most his company had ever made was less than $4,000, which is far below the earning potential of a college graduate. No evidence was presented that Husband's back problems limited his ability to maintain full time employment, especially the type of employment he held before starting his own business. Moreover, it is clear from Husband's testimony that he would rather keep running his unsuccessful business and receive $1,000 a month from Wife than obtain full time employment and attempt to keep running his business. No testimony was provided to show that Husband's business was a full time job, rather this Court remains unsure of what Husband actually does all day. Testimony only showed that he makes some calls and visits some businesses; no evidence was presented that his business keeps him from working full time somewhere else until his own company is able to support him in a manner equivalent to his earning ability. Based on the foregoing, we find that the trial court did not err when it found Husband voluntarily under-employed.
 Imputed Income {¶ 57} As previously discussed, the trial court did not establish spousal support at the divorce trial because it did not have evidence as to "what [Husband] previously earned or what he could or should be earning." The trial court set a hearing to determine Husband's imputed income and informed the parties that if they submitted stipulated evidence on the issue it would cancel the hearing and make a ruling based on said evidence. In a Judgment Entry filed October 27, 2004, the trial court stated that the parties submitted the matter on "their stipulated financial documents" and that it was basing its decision on those documents. The trial court found that Husband was currently employed, full-time, at Dawes Transport Inc. earning $10 per hour, for an annual income of $20,800. The trial court stated that in his last year of full-time employment, which was 2000, Husband earned $35,328.40; the trial court also found that in 1998 Husband earned $36,104.73 and in 1999 he earned $53,820.78. Based on Husband's previous income, the trial court found that he "clearly has the ability to earn more than $20,800 per year." The trial court then averaged Husband's annual incomes form 1998-2000, his last three years of full time employment, and imputed him with an income of $41,751.30. Husband has argued that the trial court's imputation of income and its spousal support award was unreasonable and inequitable.
 {¶ 58} An appellant has the burden on appeal. See App.R. 16(A)(7); Loc.R. 7(A)(7). "It is the duty of the appellant, not this court, to demonstrate his assigned error through an argument that is supported by citations to legal authority and facts in the record." State v. Taylor
(Feb. 9, 1999), 9th Dist. No. 2783-M, at 7. See also, App.R. 16(A)(7); Loc.R. 7(A)(7). Moreover, pursuant to App.R. 9 and Loc.R. 5, an appellant bears the burden to ensure that the record necessary to determine the appeal is before the appellate court. App.R. 9(B); Loc.R. 5(A). State v.McCowan, 9th Dist. No. 02CA008124, 2003-Ohio-1797, at ¶ 6, citing Statev. Williams (1995), 73 Ohio St.3d 153, 160. If the record is incomplete, an appellate court must presume that the trial court acted with regularity and with sufficient evidence to support its findings. McCowan
at ¶ 6, citing State v. Miller (June 7, 2000), 9th Dist. No. 19810.
 {¶ 59} In the instant matter, Husband has argued that the trial court erred in its award of spousal support which was determined in the above mentioned October 27, 2004 judgment entry. As previously discussed the trial court used stipulations by the parties to determine the spousal support award. A review of the evidence before this Court reveals that said stipulations are not included in the record. Thus, in this case, we must presume the regularity of the trial court's spousal support award.
 {¶ 60} Based on the foregoing, Husband's fifth assignment of error lacks merit.
 III {¶ 61} Husband's first and fifth assignments of error are overruled. Husband's second assignment of error is sustained. Husband's third and fourth assignments of error are sustained in part and overruled in part. The judgment of the trial court is affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.
Judgment affirmed in part, reversed in part, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to both parties equally.
Exceptions.
Slaby, P.J., Carr, J., concur.
[1] No children were born as issue to the marriage.
[2] Husband testified to this same transaction concerning the tracing of his 401(K) funds.
[3] R.C. 3119.01(C)(5) defines "income" "[f]or a parent who is unemployed or underemployed, the sum of the gross income of the parent and any potential income of the parent."