[Cite as *Forcier v. Forcier*, 2019-Ohio-5052.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# GEAUGA COUNTY, OHIO

| | | |
|---|---|---|
| BEVERLY FORCIER, | : | **O P I N I O N** |
| Plaintiff-Appellant, | : | |
| - vs - | : | **CASE NO. 2019-G-0192** |
| PAUL GERARD FORCIER, et al., | : | |
| Defendant-Appellee. | : | |

Appeal from the Geauga County Court of Common Pleas, Case No. 2015 D 000574.

Judgment: Modified and affirmed as modified.

*Amy M. Keating, Christopher R. Reynolds* and *Kyleigh A. Weinfurtner,* Zashin & Rich Co., LPA, 950 Main Avenue, Fourth Floor, Cleveland, OH 44113 (For Plaintiff-Appellant).

*Dominic M. Antonelli* and *Kristen A. Crane,* Kvale Antonelli & RAJ, 1406 West Sixth Street, Second Floor, Cleveland, OH 44113 (For Defendant-Appellee).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Dr. Beverly Forcier, appeals from the final judgment granting a divorce to appellee, Dr. Paul Gerard Forcier. The issues on appeal are threefold. Appellant challenges: (1) the trial court's modification of the magistrate's decision regarding whether appellant is entitled to interest on her separate property; (2) the trial court's adoption of the magistrate's decision that appellee did not engage in financial misconduct; and (3) the trial court's adoption of the magistrate's decision that certain

real property, gifted to appellee by appellant's parents, is his separate property. We modify the judgment and affirm as modified.

{¶2} The parties, each medical doctors, were married in December 1979. Four children, all emancipated, were born of the marriage. Early in the marriage, appellant worked full time as an ophthalmologist, but as the parties' children were born, she reduced her hours, eventually retiring in 1997. Appellee, an orthopedic surgeon, has been the parties' primary wage earner. Throughout their marriage, the parties invested in real estate and had multiple investment accounts, some were held jointly and others individually. Appellee managed the parties' finances and controlled the various accounts. Although the parties had a relatively high income due to appellee's salary and their investments, they lived frugally. Ultimately, between their incomes, savings, funds received as gifts, and investments, the marital estate grew in excess of $15 million. The parties separated in 2015 and appellant subsequently filed for divorce. During litigation, multiple stipulations were filed. After many of the issues were settled, four matters remained for the trial court to decide: (1) the disposition of marital property in Haywood County, Tennessee; (2) the disposition of property in Carroll County, Ohio; (3) the disposition of appellee's separate property; and (4) whether appellee committed financial misconduct and violated his duty to support appellant.

{¶3} At the final hearing, evidence demonstrated the parties owned some 561.01 acres of real property located in Haywood County, Tennessee. Between 1998 and 2003, the parties paid approximately $660,000 for the property. Both parties sought to retain the property free and clear of any claim by the other. Appellant argued she should be entitled to retrain the property due to its personal value and the ancestral

2

connections to her family; appellee asserted he should be entitled to the property due to its past, present, and future investment value.

{¶4} Appellant, who was interested in genealogy, traced her family's ownership of land in Haywood County from the 1820s. She had fond childhood memories of trips to Haywood County to visit relatives. In 2004, the parties learned of a potential large industrial "megasite" that the Tennessee Valley Authority was developing on property adjoining the Haywood County property. At the time of trial, however, there was no indication that any development of the "megasite" had or would commence. Still, appellee testified the parties investigated other properties, one in Iowa, prior to purchasing the Tennessee land and selected the Haywood County property due to the greater rate of return on potential rental income. He further asserted the proximity to the potential "megasite" would cause the property to significantly increase the land's value.

{¶5} Appellant enlisted John Powell Jenkins, a certified appraiser in the state of Tennessee, to assign a value to the Haywood County property. After visiting the property, taking photos, and reviewing comparable sales, Mr. Jenkins concluded the property had a market value, at the time of the final hearing, of $1,856,943. Mr. Jenkins noted he was aware of the potential "megasite," and inquired locally about its development. When he visited the property, Mr. Jenkins did not observe any indication that the adjacent land was being developed.

{¶6} In lieu of completely divesting one of the party's entire possessory interest in the property, appellee proposed dividing Haywood County property. Mr. Jenkins, however, testified partitioning the property, such that each party would receive equal

3

value, would be difficult. The property includes agricultural fields, wooded areas, and, due to its size, aspects of the land do not have enough road frontage to effectively divide the land. In light of these points, not every acre or region of the land is of equal or similar value. He opined the property's best and most lucrative use was farming and nothing would indicate this would change in the future.

{¶7} Appellant's parents owned substantial real estate and assets and, during the parties' marriage, her parents transferred interest in numerous properties to appellant, appellee, and their children. In 1991, appellee received an undivided one-sixth interest in the property in Carroll County, Ohio. The other deeded owners were appellant's niece, her two nephews, and the parties' two sons. Since obtaining an ownership interest in the property, appellee has received one-sixth of the rents and other income associated with the same.

{¶8} Appellant sought to impose a constructive trust upon appellee's interest in the Carroll County Property for the benefit of the parties' two daughters and nephew and designate appellant as the trustee. According to appellant, when the one-sixth interest was transferred to appellee, her parents intended him to be merely a placeholder. Specifically, she asserted her parents, in transferring the interest, were maximizing their annual exclusion for purposes of estate and gift taxes; their ultimate goal was to have appellee transfer the one-sixth interest to their living grandchildren and not give appellee an indefinite ownership interest. Appellee maintained he was not aware he was a mere placeholder until the divorce was filed.

{¶9} Appellant testified she and appellee discussed transferring his interest in the Carroll County property in 2011, pursuant to the alleged intention of her parents.

Appellee, however, was unwilling to transfer, but, according to appellant, he did not dispute the plan to eventually transfer the interest. Moreover, appellant's sister stated she recalled hearing appellee and her father discussing the "pass through," for the benefit of the grandchildren.

{¶10} Appellant hired Brent Tyler Kuwatch, a licensed real estate appraiser in the state of Ohio. Mr. Kuwatch appraised the Carroll County Property with a market value of $705,000.

{¶11} With respect to appellant's separate property, appellant's parents gifted numerous properties to her and her siblings. Starting in 2006, the parties notified appellant's siblings and advised them they no longer wished to be joint owners. The various properties were ultimately sold and appellee deposited the proceeds from the sale in the parties' joint accounts. These funds were therefore commingled with marital assets. Appellant asserted appellee compelled her to sell the properties, which caused a rift with her siblings. Appellee stated that appellant had problems with her siblings prior to the sales and he believed selling the properties would eliminate the problems. Between the proceeds from the sales of the properties, proceeds received from the state of Tennessee in compensation for property taken by eminent domain, and other income from separate-property interests, appellant received $2,242,836 through gifts and inheritances from 2003 through 2014.

{¶12} Both parties had access to their joint accounts, but appellee wrote nearly all checks and managed all finances. Appellee was an active investor of both marital and separate funds. And, according to appellant, appellee would frequently endorse her name on checks and other financial documents without her knowledge or

permission. Sometime after 2007, appellee ceased depositing his income into the parties' joint account, which was used to fund family expenses, and commenced dissipation of over $1,000,000 in appellant's separate property. Appellee asserted he treated all funds as "our" money and moved the funds to maximize investments.

{¶13} Appellant retained John D. Davis, an expert in public accounting, forensic accounting, and valuation analysis, to trace her separate property. Mr. Davis noted three tracing methodologies employed by forensic accountants: direct tracing, lowest intermediate balance, and proportionate share. Mr. Davis stated he used direct tracing to identify the amounts going into the accounts and then utilized the lowest intermediate balance to identify the assets that continued to exist as separate property. He noted he did not use the proportional share approach because it assumes the deposited funds are fungible; in this matter, he maintained, the cash in the accounts was not fungible, but rather included both marital and separate property.

{¶14} Mr. Davis also testified he used the lowest intermediate balance approach because it provided for equitable recovery of the assets based on the parties' intentions; to wit, appellant's intention to keep her separate property separate and appellee's financial intentions, circumstantially gleaned from his patterns of deposits, non-deposits, and withdrawals from the family's operating account(s). Moreover, according to Mr. Davis, the lowest intermediate balance approach assumes traced assets exist as long as the account balance does not fall below the amount on deposit. Put differently, when separate assets were deposited into the joint accounts, marital funds are utilized to pay expenses first and, if the balance falls below the original amount in marital funds, the separate property is still traceable, as long as it is not dissipated. Of the $2,242,836 in

6

separate property appellant inherited, Mr. Davis was able to trace $1,075,907 of actual funds located in accounts existing at the date of trial. In addition, Mr. Davis calculated the traced funds passively accumulated $428,065 in interest, for a total of $1,503,972 of total traced property, plus interest.

{¶15} Appellee retained Robert Nemeth, a certified public accountant, a certified valuation analyst, and a certified divorce financial analyst to trace the parties' separate property. Mr. Nemeth utilized the proportional share methodology, which follows transactions in an account and adjusts parties' separate versus marital assets. The tables used by Mr. Nemeth were prepared by appellee, at Mr. Nemeth's direction. Mr. Nemeth ultimately testified to $300,000 of "misclassifications," (marital property rather than appellant's separate property), which impacted the amount to which the parties were entitled. Mr. Nemeth concluded that appellant should be awarded $740,551 in separate property.

{¶16} After the hearing, the magistrate issued her decision. She concluded appellant should retain the Haywood County, Tennessee property, valued at $1,856,943, and appellee was entitled to one-half the value of the property, i.e., $928,471.50. In so concluding, the magistrate found:

> {¶17} It is difficult to believe Defendant that the parties purchased this property purely as an investment with no consideration as to any family connection. While Defendant may have agreed to the purchase for the reasons he stated, instead of purchasing a farm in Iowa, the parties purchased a property that Plaintiff and her family visited in her childhood, a property that bordered property owned by Plaintiff's parents and later gifted to the parties' children. There is a reliable fair market value for the property. By allowing Plaintiff to retain the property and compensate Defendant his half, the parties are saving the cost of sale and avoiding potential real estate tax consequences as well as potential income tax consequences.

7

{¶18} The magistrate next concluded appellee should retain the one-sixth interest in the Carroll County, Ohio property as well as the rents associated with the same. In support, the magistrate found that had appellant's parents intended to deed appellee something different than the one-sixth ownership interest, they could have attached conditions to the grant. The magistrate determined "[p]laintiff's parents were wealthy, tax conscious, and financially savvy. If they had intended to do anything other than give defendant an interest in the property, they had the knowledge and the means to do so."

{¶19} Next, the magistrate determined the traceable amount of separate property to which appellant was entitled is $1,075,907, the amount traced by appellant's expert using the lowest intermediate balance method. She further determined appellant should be entitled to $428,065 in passive interest based upon the actual rate of return the separate funds would have generated.

{¶20} The magistrate additionally recommended that "all marital property be divided equally between the parties with the parties retaining the assets pursuant to exhibit B." Exhibit B included tables setting forth marital assets as well as separate assets that were ostensibly not in dispute at the hearing.

{¶21} Finally, the magistrate determined both parties are wealthy, well educated, tax conscious, financially savvy, and competent professionals. And no evidence was adduced to show appellant was unable to access the joint bank account or look out for her own personal and financial interests. The magistrate thus found both parties are capable of supporting themselves and no statutory duty of support was breached. The magistrate also concluded appellee did not commit financial misconduct.

{¶22} The parties both filed objections to the magistrate's decision, as well as supplemental objections. Appellee objected to the amount of traceable separate property, along with interest, the magistrate awarded appellant; appellee further claimed the magistrate erred in awarding the Haywood County, Tennessee real property to appellant. Alternatively, appellant asserted the magistrate committed error in concluding appellee did not breach his statutory duty of support as well as her decision that appellee did not commit financial misconduct. Appellant further objected to the magistrate's decision that appellee should retain the one-sixth interest in the Carroll County, Ohio property, including the proceeds derived from the property.

{¶23} After considering the parties' objections, the trial court modified the magistrate's decision and adopted it as modified. In particular, the trial court agreed that the value of appellant's separate property is $1,075,907. The court, however, determined it did not "agree that plaintiff is entitled to interest or appreciation upon the separate property determined by the lowest intermediate balance approach." The court did not expressly disagree with any remaining dispositional recommendation of the magistrate.

{¶24} Appellant now appeals assigning three errors. She first asserts:

{¶25} "The trial court erred in failing to award appellant the $428,065 of actual appreciation on her traced separate property in contravention of the magistrate's decision."

{¶26} A party's "separate property" includes, among other things, "[a]ny gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to

9

have been given to only one spouse." R.C. 3105.171(A)(6)(a)(vii). Furthermore, "[p]assive income and appreciation acquired from separate property by one spouse during the marriage" is separate property. R.C. 3105.171(A)(6)(a)(iii). "Passive income" is defined as "income acquired other than as a result of the labor, monetary, or in-kind contribution of either spouse." R.C. 3105.171(A)(4).

{¶27} In a divorce, "[t]he trial court's role in dividing the property is to evaluate all relevant facts and arrive at an equitable division. * * * 'Equitable need not mean equal.' * * * We review a trial court's division of property for an abuse of discretion." *Hood v. Hood,* 10th Dist. Franklin No. 10AP-999, 2011-Ohio-3704, ¶14, quoting *Cherry v. Cherry,* 66 Ohio St.2d 348, 355 (1981).

{¶28} In this case, Mr. Davis, using the lowest intermediate balance method, traced $1,075,907 of appellant's separate property that had not been dissipated. He further testified that the interest earned on the invested property, totaled $428,065 in investment returns, for a total of $1,503,972. The magistrate accepted the foregoing, thereby concluding the combined investment returns were passive income, and awarded appellant $1,503,972. Appellee objected to the magistrate's recommendation, challenging Mr. Davis' use of the lowest intermediate balance approach as well as the magistrate's characterization of the interest earned on the separate property as passive income.

{¶29} In its judgment entry, the trial court concluded it did "not agree" with the magistrate's decision recommending appellant receive the interest traced using the lowest intermediate balance approach. The trial court did not elaborate on its conclusion. Given the facts and the lack of any basis for the trial court's decision, we

conclude the trial court erred in not awarding appellant the interest that was traceable to her separate property.

{¶30} In his report, Mr. Davis detailed the transfers, deposits and withdrawals from the couple's joint accounts as well as their individual accounts. The parties jointly stipulated these transactions were accurate and properly identified.

{¶31} Mr. Davis' testimony indicates he calculated the interest or appreciation based upon the actual rate and the traceable interest, as set forth in his report and his testimony, i.e., $428,065. In his report, Mr. Davis further stated "[t]he separate property in this analysis was also accumulating passive income based on investment returns. In certain instances, because of the amount of subsequent deposits in the account, I did not calculate the amount of investment income that should be attributed to the separate property because of the time and cost involved in doing so. Had I made these computations, my conclusion of the value of separate property would be higher." This point illustrates that Mr. Davis' conclusion regarding the amount of interest to which appellant was entitled on her separate property was very conservative. Nevertheless, Mr. Davis' testified to the amount of actual interest accrued through investments made with appellant's separate property and his testimony is supported by figures set forth in his report.

{¶32} The trial court, in rejecting the magistrate's decision to award appellant $428,065 in passive income, merely stated "the court does not agree that plaintiff is entitled to interest or appreciation upon the separate property determined by the lowest intermediate balance approach." The trial court did not support its disagreement with any rationale and, in light of its *acceptance* of Mr. Davis' use of the lowest intermediate

balance approach to trace appellant's separate property, the conclusion is fundamentally arbitrary. There was competent, credible evidence to support the magistrate's decision recommending that appellant is entitled to both $1,075,907 in separate property as well as $428,065 in passive income from the interest returns on that property. We therefore hold the trial court abused its discretion in failing to award wife $1,503,972. The trial court's judgment excluding the $428,065 of passive income was error and we modify the trial court's judgment to reflect appellant's entitlement to this separate property and affirm the judgment as modified.[1]

{¶33} Appellant's first assignment of error has merit.

{¶34} Appellant's second assignment of error provides:

{¶35} "The trial court erred in failing to find that appellee committed financial misconduct, which misconduct also violated his statutory duty of support to appellant, resulting in a financial loss to appellant totaling $1,696,602."

{¶36} Here appellant argues appellee intentionally failed to support her out of marital income and assets and, in doing so, committed financial misconduct in dissipating her separate property to pay marital expenses. She maintains appellee's misuse of her separate property to satisfy marital liabilities and expenses amounts to both a violation of his statutory duty to support as well as financial misconduct.

{¶37} R.C. 3103.03(A) provides: "Each married person must support the person's self and spouse out of the person's property or by the person's labor. If a married person is unable to do so, the spouse of the married person must assist in the support so far as the spouse is able."

___

1. It may be useful for the parties to offset the $18,000 appellee is owed from our disposition in Case No. 2019-G-0191 against the $428,065. If the parties elect to offset, appellant would be entitled to $410,065.

{¶38} Further, as it relates to the division of property in a domestic case, financial misconduct has a specific meaning. It includes, but is not limited to "the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets * * *." R.C. 3105.171(E)(4). Financial misconduct connotes some form of wrongdoing, such as interference with the other spouse's property rights with a wrongful scienter. *Taub v. Taub*, 10th Dist. Franklin No. 08AP-750, 2009-Ohio-2762, ¶33; *White v. White*, 5th Dist. Licking No. 15-CA-54, 2016-Ohio-2997, ¶13, citing *Bucalo v. Bucalo*, 9th Dist. Medina No. 05CA0011-M, 2005-Ohio-6319, ¶23. In cases of financial misconduct, "typically, the offending spouse * * * either profit[s] from the misconduct or intentionally defeat[s] the other spouse's distribution of marital assets." *Taub, supra,* at ¶33; quoting *Hammond v. Brown*, 8th Dist. Cuyahoga No. 67268, 1995 WL 546903 (Sept. 13, 1995); *see also Mikhail v. Mikhail*, 6th Dist. Lucas No. L-03-1195, 2005-Ohio-322, ¶28.

{¶39} Appellant testified appellee wielded complete control over financial matters in the couple's relationship. And when she would receive checks relating to her separate property, she would place them in appellee's mail stack for deposit; she also testified that, on occasions, such funds would be wire transferred at appellee's behest. Regardless, she stated she did not know what appellee did with the funds, even though both parties had access to the couple's joint account.

{¶40} Appellant, along with appellee in certain cases, were joint owners of various properties with appellant's siblings. In 2006, the couple alerted appellant's siblings and advised them that the couple no longer desired to be joint owners. Appellant maintained appellee forced her to sell the properties and, she testified, he

13

was very cruel to her if she did not follow his demands. According to appellant, a significant rift arose between her and her siblings due to the sale of the properties. After the sale in 2007 and 2008, the income was deposited by appellee in the couple's joint account. Appellant testified she thought appellee was investing her separate funds and keeping them separate. She further asserted she did not authorize the funds to be used to pay family expenses. Meanwhile, appellee began depositing his earnings into a separate savings account. Appellant noted the shift in appellee's depositing/investing patterns occurred immediately following a confrontation she had with appellee regarding seeking a separation or going to counseling.

{¶41} Appellant described her relationship with appellee as one with little power or control. She stated she was afraid of angering him and thus allowed appellee to continue to manage the family's finances without question. She asserted she was required to wear a worn-out coat and shopped at thrift stores because, despite the couple's wealth, appellee would not allow her to spend money.

{¶42} Appellee testified that, prior to 2007, he had significant concerns with being exposed to individual liability for medical malpractice. Even though he carried malpractice insurance, he felt his exposure to potential liability would exceed his coverage. As such, he did not want to place an abundance of marital funds in a joint account. He therefore deposited most income into appellant's individual account.

{¶43} Appellee further testified that appellant and her siblings had strained relationships well prior to the sale of the jointly-owned properties. He asserted, in an effort to distance themselves from the problems, he and appellant decided to sever appellant's (and in some cases his own) interest in the properties by selling them.

14

Because this created more tension, in 2006, he became concerned with appellant's exposure to lawsuits from her siblings. At or about this time, appellee noted tort reform became law in Ohio. As such, his worries of exposure to excessive medical-malpractice liability diminished, but his concern that appellant's vindictive siblings would file suit increased. Appellee therefore began transferring assets from appellant's individual account to his name with the goal of isolating what he believed to be the couple's assets from appellant's siblings.

{¶44} Appellee admitted that he placed approximately $2,000,000 of appellant's separate funds into the joint account or other accounts not in appellant's name. He also stated, however, over the years, appellant never gave him any instruction to segregate these funds. He testified when appellant received the funds, some were wired, at appellant's direction, and some were placed by appellant in appellee's "mail pile" for deposit. He testified he deposited most of the money into the parties' joint family account and, during this timeframe, the family had significant outgoing expenses, including tuition for three children in private high school, and one child in college. He emphasized his purpose in investing was not to appropriate appellant's separate property, but to maximize returns and avoid loss to funds he characterized as "ours."

{¶45} In concluding no duty of support was breached and appellant did not engage in financial misconduct, the magistrate stated there was no evidence demonstrating appellant could not access the joint account or look out for her own personal and financial interests. The trial court adopted this recommendation. Although some significant dissipation occurred, appellee's testimony regarding his management of the separate and marital funds, while somewhat misguided occasionally, did not

15

reflect a "wrongful scienter" or an attempt to intentionally defeat appellant's property distribution. And, while appellant's testimony suggested appellee sought to benefit himself by surreptitiously commingling her funds while placing his income in a separate account, this is not a necessary inference in light of his testimony. We therefore hold the trial court did not abuse its discretion in concluding appellee neither violated his duty to support nor engaged in financial misconduct.

{¶46} Appellant's second assignment of error lacks merit.

{¶47} Appellant's third assignment of error provides:

{¶48} "The trial court erred in failing to impose a constructive trust upon the one-sixth interest in the Carroll County, Ohio property titled to appellee, and the associated rents derived therefrom, for the benefit of the parties' two daughters and appellant's nephew."

{¶49} Appellant asserts the trial court erred in adopting the magistrate's decision awarding the Carroll County property to appellee because the prior owners, appellant's parents, lacked the donative intent to create a valid gift. She further contends appellee stood in a position of confidence with her parents and thus, as a fiduciary and family member, a presumption of undue influence arose which required appellant to demonstrate appellee acted free of coercion or fraud.

{¶50} We first point out that appellant does not request this court to negate the gift because she has some direct or specific interest in the property; rather, she seeks the gift to be declared invalid and a constructive trust be placed on the interest for the benefit of the now-surviving grandchildren of her parents. She thus is making an argument in a representative capacity for non-parties who allegedly have an interest in

16

the property deeded to appellee. "[T]he fundamental requirement of standing is that the party bringing the action must have a personal stake in the outcome of the controversy, i.e., that it must be the injured party." *Deutsche Bank Natl. Trust Co. v. Holden*, 147 Ohio St.3d 85, 2016-Ohio-4603, ¶32.   Because appellant is not arguing the property should be considered an aspect of the marital estate and thus appellant's ownership interest would be inequitable in relation to property distribution, it is not clear she has standing to assert the instant argument, let alone obtain the relief requested.   Still, appellee did not raise the standing issue and thus we shall proceed to address the merits of appellant's argument.

{¶51}   The elements of a valid inter vivos gift require proof of the following:  (1) the donor must intend to make an immediate gift of the property; (2) the donor must deliver the property to the donee; and (3) the donor must relinquish all dominion and control of the property.   *Streeper v. Myers*, 132 Ohio St. 322 (1937), paragraph one of the syllabus.

{¶52} Initially, there was no evidence that appellee stood in a fiduciary relationship to appellant's parents.   The record indicates he had a friendly congenial relationship with them.   He testified he would visit appellant's father weekly when they lived near the parties. This congenial association, however, does not indicate appellant stood in a special position of trust and confidence that would place appellee in the position of a fiduciary.   We therefore decline to accept appellant's argument that appellee was required to rebut a presumption of undue influence vis-à-vis the gift.

{¶53}   Evidence was adduced that the donor, appellant's mother, was alive at the time the deed was executed and both of appellant's parents signed the deed.    The

17

deed, which listed appellee and five others as grantees, stated the donor has "given, granted, remised, released, and forever quit-claimed" the property in question to the grantees. There were no conditions attached to appellant's interest and the deed demonstrates the intention of the donor to transfer a present possessory, one-sixth interest in the property to appellee. Accordingly, the deed facially satisfies each requirement of a valid inter vivos gift.

{¶54} Appellant cites her sister's testimony, where she recalled a family meeting wherein appellee and appellant's father discussed and allegedly agreed that appellee would eventually transfer his interest to grandchildren. Appellee, however, stated he had no recollection of the meeting. She also cites a previous instance in which appellee acted in the capacity of a placeholder for appellant's father in a separate piece of real property. In that instance, appellee acknowledged appellant's father, after transferring an interest to appellee in the property, presented him with a quitclaim deed to sign away his interest., which he did. With respect to the Carroll County property, appellee testified he was never instructed he was a mere placeholder and the first he heard of the assertion was the initiation of the divorce proceedings. Moreover, appellant's father or mother never approached him and asked him to sign his interest in the property away to another. Simply because he was arguably a placeholder in a previous instance does not establish, in light of the language of the deed and the inaction of appellant's parents, that he must be a mere placeholder over the Carroll County property. And appellant's assertion that the foregoing establishes fraud on appellee's behalf assumes what still requires some proof; namely, that the unconditional language of the deed was actually conditional.

{¶55} Not surprisingly, the parties take completely opposing positions on this issue. The trier of fact is in the best position to evaluate the credibility of the testimony and evidence and adjudicate any conflicts arising therefrom. *See Hvamb v. Mishne,* 11th Dist. Geauga No. 2002-G-2418, 2003-Ohio-921, ¶18. On this issue, the magistrate agreed with appellee's position that a valid, inter vivos transfer occurred. The trial court agreed with the magistrate and adopted this conclusion. We cannot say the trial court abused its discretion in doing so.

{¶56} Appellant's third assignment of error lacks merit.

{¶57} For the reasons discussed in this opinion, the judgment of the Geauga County Court of Common Pleas is modified and affirmed as modified.


THOMAS R. WRIGHT, P.J.,

MARY JANE TRAPP, J.,

concur.