OSTMANN, Appellee,

v.

OSTMANN, Appellant.

[Cite as *Ostmann v. Ostmann*, 168 Ohio App.3d 59, 2006-Ohio-3617.]

Court of Appeals of Ohio,
Ninth District, Medina County.

No. 05CA0081–M.

Decided July 17, 2006.

60

---

Richard J. Marco Jr., for appellant.

James B. Palmquist III, and Todd E. Cheek, for appellee.

WHITMORE, Judge.

{¶ 1} Defendant–appellant, Howard Ostmann, has appealed from multiple judgments of the Medina County Court of Common Pleas, Domestic Relations Division ("Medina County Domestic Relations Court"), which granted him and plaintiff-appellee, Lorinda Lewandowksi, f.k.a. Lorinda Ostmann, a divorce and divided the marital property.[1]  This court affirms in part and reverses in part.

I

{¶ 2} On November 12, 2002, Lorinda filed for divorce in the Medina County Domestic Relations Court and moved for spousal support, child support, and custody pendente lite.  Because the parties were still living together, the trial court issued a temporary order on December 3, 2002, directing the parties to conduct their finances as they had before the divorce was filed.  On December 4, 2002, Howard filed an answer to the complaint and a counterclaim alleging the existence of nonmarital property.

{¶ 3} On January 9, 2003, Lorinda filed a show-cause motion against Howard, alleging that he was in contempt for failure to comply with the court's December 3, 2002 order.  On April 2, 2003, the magistrate found Howard in contempt.  On May 2, 2003, the trial court adopted the magistrate's decision and included a provision for Howard to purge the contempt.  On May 23, 2003, following a hearing, the trial court found that Howard had purged his contempt and ordered that the parties continue to abide by the temporary orders already in place.

{¶ 4} The divorce hearing was held on November 10 and 12, 2003.  On February 18, 2004, Howard filed a motion to modify the temporary orders and a show-cause motion against Lorinda, alleging that she should be held in contempt for violating the court's temporary order.  On April 13, 2004, the trial court entered its final judgment entry of divorce.

{¶ 5} On April 30, 2004, the magistrate dismissed Howard's motions.  On May 12, 2004, Howard filed objections to the magistrate's decision.  On June 18, 2004, the trial court entered a qualified domestic relations order that provided for the division of retirement benefits.  On July 14, 2004, Howard appealed to this court from the final judgment entry and qualified domestic relations order.  On May 23, 2005, this court dismissed Howard's appeal for lack of a final, appealable

---

1.  Howard's notice of appeal specifically states that he is appealing the "Final Judgment Entry of Divorce entered on the 13th day of April, 2004 followed by the Qualified Domestic Relations Order entered on the 18th day of June, 2004 and the Findings & Judgment Entry entered on August 31, 2004."  However, Howard's assignments of error are solely related to the final divorce decree's division of property and the determination of child and spousal support.

order.[2]  On August 31, 2005, the trial court affirmed and adopted the magistrate's decision of April 30, 2004, dismissing Howard's pending motions.

{¶ 6} Howard has timely appealed, asserting four assignments of error.

## II

### Assignment of Error Number One

Whether the trial court erred in establishing the separate property interests of Howard Ostmann as to the real estate as the only credible evidence established that of the $199,000 purchase price, $76,069 came from Howard Ostmann's separate property thereby establishing a separate interest of 40% resulting in the separate property interest of $106,000 as to the $265,000 stipulated value of said real estate.

{¶ 7} In his first assignment of error, Howard argues that the trial court erred in dividing the marital property.  Specifically, Howard argues that the trial court improperly determined the separate property interest with regard to the marital residence.  We agree.

{¶ 8} The distribution of assets in a divorce proceeding is governed by R.C. 3105.171.  *Bucalo v. Bucalo*, 9th Dist. No. 05CA0011–M, 2005-Ohio-6319, 2005 WL 3193851, at ¶ 11.  Prior to distributing any assets, the trial court is required by statute to determine whether property is marital or separate property.  Id. See R.C. 3105.171(B).  Separate property includes, but is not limited to, "[a]n inheritance by one spouse by bequest, devise, or descent during the course of the marriage."  R.C. 3105.171(A)(6)(a)(i).[3]

{¶ 9} This court has held that the "characterization of property as either marital or separate is a factual inquiry, and we review such characterization under a manifest weight of the evidence standard."  *Morris v. Morris*, 9th Dist. No. 22778, 2006-Ohio-1560, 2006 WL 826078, at ¶ 23, citing *Boreman v. Boreman*, 9th Dist. No. 01CA0034, 2002-Ohio-2320, 2002 WL 1022990, at ¶ 7–8.  Therefore, we must affirm the trial court's characterization if it is supported by competent, credible evidence.  *Bucalo* at ¶ 12.  This standard of review "is highly deferential and even 'some' evidence is sufficient to sustain the judgment and prevent a reversal."  *Barkley v. Barkley* (1997), 119 Ohio App.3d 155, 159, 694 N.E.2d 989.

---

2.  Specifically, this court held that it did not have jurisdiction because the objections to the magistrate's decision remained pending with the court.

3.  This definition of "separate property" should not be confused with R.C. 3105.171(A)(6)(a)(vii), which defines "separate property" as "[a]ny gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse."

{¶ 10} Howard claims that 40 percent of the purchase price of the marital home, or $76,069, was derived from his separate property. Howard argues that he thus has a separate property interest of 40 percent of the $265,000 stipulated current market value of the marital home. We agree.

{¶ 11} Pursuant to R.C. 3105.171(A)(6)(b), "[t]he commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." This court has held that "traceability is the issue when determining whether separate property remains separate property once it has been commingled with marital property." *Bucalo*, 9th Dist. No. 05CA0011–M, 2005-Ohio-6319, 2005 WL 3193851, at ¶ 13, citing *Wheeler v. Wheeler* (Dec. 12, 2001), 9th Dist. No. 3188–M, 2001 WL 1581574, at 6. "The party seeking to have the commingled property deemed separate property has the burden of proof, by a preponderance of the evidence, to trace the asset to his or her separate property." *West v. West* (Mar. 13, 2002), 9th Dist. No. 01CA0045, 2002 WL 388845, at ¶ 27.

{¶ 12} Howard argues that three instances of separate property may be traced to the marital residence. We shall address each individually for clarity.

### *The $20,000 Inheritance*

{¶ 13} At the divorce hearing, Howard testified to the following. Prior to purchasing the marital residence, located at 3664 Foskett Road, Medina, Ohio (the "Foskett home"), the couple resided at 990 Lancaster Drive, Medina, Ohio (the "Lancaster home"). According to Howard, the couple paid off the mortgage on the Lancaster home on January 4, 1993. Howard testified that the mortgage was paid off in large part by two $10,000 checks that he received after the death of his grandmother, which he immediately applied to the mortgage. Howard argues that this separate property payment on the Lancaster home's mortgage contributed to an increased profit from the sale of the Lancaster home, which in turn improved the couple's ability to purchase the Foskett home.

{¶ 14} The record shows that Howard received two $10,000 checks, sequentially numbered and dated January 1, 1993. The checks were cashier's checks from Society National Bank in Cleveland, Ohio. Howard is identified on both checks as the sole payee. Howard's father, Werner Ostmann, is identified as the remitter on check number 1888138, and Howard's mother, Dorothy Ostmann is identified as the remitter on check number 1888139.

{¶ 15} Howard testified that he applied the $20,000 inheritance to the Lancaster home mortgage on January 4, 1993. However, while both checks appear to be endorsed by Howard, there is no evidence of what exactly was done with the $20,000. The only evidence in the record is a statement purportedly from the

bank[4] showing a beginning balance of $28,537.34 on the mortgage and an ending balance of $0.00 as of January 4, 1993.

{¶ 16} Lorinda did not testify regarding the $20,000 inheritance and its potential application to the Lancaster home mortgage.

{¶ 17} This court finds that Howard has demonstrated by a preponderance of the evidence that the $20,000 he individually received as an inheritance was used to pay down the Lancaster home mortgage. There is evidence that Howard received the inheritance and there is evidence that the inheritance was endorsed over to somebody. Additionally, there is evidence in the form of a bank statement that the Lancaster home mortgage was paid off within three days of the date of the checks. In addition to the physical evidence, there is Howard's sworn testimony that he applied the $20,000 to the mortgage, and that testimony is not refuted by Lorinda.

{¶ 18} The trial court made a specific finding that "[t]he couple paid off $20,000 with two checks of $10,000 each received from the Husband's parents on January 2, 1993 and used to pay off the [Lancaster] mortgage on January 4, 1993." Because we are required to affirm the trial court's findings if they are supported by even "some" competent, credible evidence, we find that Howard applied his $20,000 inheritance to the Lancaster home mortgage. See *Bucalo,* 9th Dist. No. 05CA0011–M, 2005-Ohio-6319, 2005 WL 3193851, at ¶ 12.

{¶ 19} Therefore, this court finds that based upon the evidence, Howard has traced his $20,000 inheritance to the Foskett home by a preponderance of the evidence and, therefore, it has maintained its identity as separate property.

### The $38,812 Inheritance

{¶ 20} The couple purchased the Foskett home in 1997 for $199,000. The couple paid a down payment of $2,000 and was left with a balance of $196,228.35.[5] Because the couple had not yet sold the Lancaster home, Howard's mother loaned the couple the balance due in order to purchase the Foskett home. Howard testified that in 1998, he received an inheritance after the death of his father in the amount of $38,812.39. He further testified that he turned those funds over to Dorothy in partial repayment of the $196,228.35 debt owed on the Foskett home. Lorinda did not refute this testimony.

{¶ 21} The physical evidence in the record consists of a copy of a Charter One Bank official check, made out to Howard H. Ostmann, from the Werner W.

---

4. The bank is not identified on the statement.

5. The settlement statement admitted into evidence showed that after settlement charges, the gross amount due from the borrower was $199,662.50. After the $2,000 deposit and $1,434.15 in county taxes, the total deposited to Lawyer's Title was $196,228.35.

Ostmann Trust, in the amount of $38,812.39. The check has "VOID" stamped on its face. However, whereas the two $10,000 checks were photocopied on both sides, evidencing Howard's endorsement, the instant check bears no proof that it was endorsed by Howard over to Dorothy.

{¶ 22} However, this court is persuaded that Howard applied the $38,812.39 to the debt the couple owed on the marital home. First, the evidence establishes that Howard did, in fact, receive a check in the amount of $38,812.39. Second, the evidence also establishes that Lorinda signed over to Dorothy the $137,159.12 in proceeds from the sale of the Lancaster home, in partial repayment of the debt owed on the Foskett home.[6] This pay down resulted in a balance of $59,069.23. Third, the evidence establishes that Dorothy presented, and Howard signed,[7] a promissory note in the amount of $20,256.84 to satisfy the remaining debt owed to Dorothy for the Foskett home. Reducing the $59,069.23 owed by the $20,256.84 promissory note leaves a balance of $38,812.39.

{¶ 23} This court finds it to be an extreme coincidence that Dorothy presented Howard and Lorinda with a promissory note for the exact amount, to the penny, owed her if Howard had in fact applied his $38,812.39 inheritance to the Foskett home debt. Additionally, this court notes that the preponderance of the evidence standard is synonymous with the phrase "more likely than not." See *Haughey v. Twins Group, Inc.,* 2nd Dist. No. 2004–CA–7, 2005-Ohio-1371, 2005 WL 678919, at ¶ 32. Therefore, we conclude that Howard has traced, by a preponderance of the evidence, his $38,812.39 inheritance to the marital residence.

### The $20,256.84 Promissory Note

{¶ 24} Howard argues that the promissory note secured by Dorothy for repayment of the $20,256.84 remaining on the Foskett home should be considered separate property. He further argues that since only his signature appears on the document, he alone is responsible for paying the debt on the Foskett home and, therefore, $20,256.84 should be included in his separate property interest.

{¶ 25} The trial court held that the $20,256.84 was a separate property interest held solely by Howard, and it was not factored into the marital contribution calculation regarding the Foskett home. Therefore, we find that the $20,256.84 constitutes a separate property interest.

---

6. Lorinda claimed that she did not know who had fronted the money for the Foskett home. Later, however, she testified, "I owed that [money] to her." Later in her testimony, when asked whether she owed the money to Dorothy, Lorinda testified that she had signed the check over to Dorothy because "that's where I was told it was to go" and that she "[didn't] know where the money came from." Regardless, it is clear to this court that Lorinda signed over the $137,159.12 to Dorothy in partial repayment of the Foskett home debt.

7. Lorinda refused to sign the promissory note.

*The Appreciation*

{¶ 26} It is clear that the Foskett home appreciated in value during the marriage from $199,000 to $265,000, an increase of $66,000. "Allocation of appreciation on a residence in a divorce * * * rests upon whether the appreciation is labeled passive or active." *Sterbenz v. Sterbenz*, 9th Dist. No. 21865, 2004-Ohio-4577, 2004 WL 1933196, at ¶ 5. Appreciation that occurs on separate property "due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage" is considered marital property. R.C. 3105.171(A)(3)(a)(iii). This is known as active appreciation. See *Sterbenz* at ¶ 5, citing *Middendorf v. Middendorf* (1998), 82 Ohio St.3d 397, 400, 696 N.E.2d 575. Appreciation that occurs on separate property "due solely to market forces, such as location and inflation, however, is passive inflation and remains separate property." *Sterbenz* at ¶ 5; R.C. 3105.171(A)(6)(a)(iii).

{¶ 27} Howard argues that he is entitled to his separate property interest in the appreciated fair market value of the Foskett home. Howard essentially argues that he has a 40 percent separate investment in the marital home. According to Howard, because the marital home has appreciated in value, he should get the appreciated value of his 40 percent investment in that home. The trial court concluded that the appreciation in the home was passive and realized during the marriage on the marital investment and, therefore, the appreciation was marital and subject to equal division. We are persuaded by Howard's argument.

{¶ 28} Separate property, once traced, is to be distributed to its individual owner pursuant to R.C. 3105.171(D). *Salmon v. Salmon*, 9th Dist. No. 22745, 2006-Ohio-1557, 2006 WL 826328, at ¶ 9. Further, "any passive appreciation of that separate property is also removed from the commingled marital property and distributed to the individual owner." Id., citing R.C. 3105.171(A)(6)(a)(iii). In *Salmon*, this court stated, "In the case of a marital residence, passive appreciation includes the increased equity in the home due to market conditions, as opposed to active appreciation resulting from investment or labor." Id. at ¶ 10.

{¶ 29} As the trial court surmised, there was no evidence provided by either party that the appreciation was anything other than passive. However, contrary to the trial court's finding that the entire amount of appreciation was marital property, it is the conclusion of this court that the Revised Code specifically mandates that Howard receive the appreciation on his separate property interest. See R.C. 3105.171(A)(6)(a)(iii); *Salmon* at ¶ 5. We find that because Howard has a 40 percent separate property interest in the marital home, the appreciation on that property interest remains separate property to be distributed to Howard.

See R.C. 3105.171(A)(6)(a)(iii); *Salmon* at ¶ 5. Therefore, in addition to his marital share, 40 percent of the appreciation of the value should be Howard's.

*Conclusion*

{¶ 30} We conclude that Howard has traced, by a preponderance of the evidence, separate property used to fund the marital residence. This court finds that his separate property interest is in the amount of $79,069.23, or 40 percent of the $199,000 purchase price of the Foskett home. In addition to this separate property interest, we find that Howard has a 40 percent property interest in the $66,000 passive appreciation of the marital residence, in addition to his marital share of the appreciation.[8]

{¶ 31} Howard's first assignment of error has merit.

### Assignment of Error Number Two

Whether the trial court erred in establishing a $16,121 value for a three-year-old leased vehicle and, thereby, caused an unequal division of property.

{¶ 32} In his second assignment of error, Howard argues that the trial court improperly established the value for Howard's vehicle and thereby caused an unequal distribution of property. Howard specifically argues that the court had no basis for establishing the value of Howard's company vehicle as $16,121. We agree.

{¶ 33} As discussed above, the distribution of assets in a divorce proceeding is governed by R.C. 3105.171. *Bucalo*, 9th Dist. No. 05CA0011–M, 2005-Ohio-6319, 2005 WL 3193851, at ¶ 11. The trial court holds "considerable discretion in making property distributions in domestic cases." *Sterbenz*, 9th Dist. No. 21865, 2004-Ohio-4577, 2004 WL 1933196, at ¶ 9, citing *Middendorf,* 82 Ohio St.3d at 401, 696 N.E.2d 575. Therefore, we will uphold a trial court's division of property unless an abuse of discretion is present. *Sterbenz* at ¶ 9. A court has not abused its discretion unless its decision is the product of "perversity of will, passion, prejudice, partiality, or moral delinquency." *Pons v. Ohio State Med. Bd.* (1993), 66 Ohio St.3d 619, 621, 614 N.E.2d 748. Accordingly, there is no abuse of discretion when a trial court's decision is supported by some competent, credible evidence. *Middendorf,* 82 Ohio St.3d at 401, 696 N.E.2d 575.

{¶ 34} In its Final Judgment Entry for Divorce, Section III Division of Property and Debt, the trial court determined the value of Howard's company vehicle as $16,121 and included it as an offset to Lorinda's vehicle in order to

---

8. Effectively, Howard has a 40 percent share of both the purchase price of the Foskett home and its appreciation. Therefore, Howard and Lorinda would equally divide the remaining 60 percent interest in the purchase price and appreciation, or 30 percent of the purchase price and appreciation to both Lorinda and Howard.

"equalize the vehicle division" in the division of the marital residence. This court finds that the trial court abused its discretion in doing so.

{¶ 35} The record clearly reflects that Howard's company vehicle, a 2001 Dodge Dakota, VIN number 1B7GG22N01S337949, is owned by Howard's employer, Pleasant Valley Country Club. Whether Howard has used the vehicle for personal use or strictly for business purposes is irrelevant. This court finds that there is no competent, credible evidence in the record that the company truck was marital property, and therefore the trial court abused its discretion when it included the estimated value of the truck in the division of marital property.

{¶ 36} Howard's second assignment of error has merit.

### Assignment of Error Number Three

Whether the trial court erred in establishing the commencement date for its order as to child support and spousal support as the trial date instead of the date of the judgment entry when the temporary order provided that Mr. Ostmann was required to deposit all of his monies into the joint bank account of the parties and Mrs. Ostmann was to pay all of the marital bills from said account.

{¶ 37} In his third assignment of error, Howard argues that the trial court erred when it ordered the payment of child and spousal support retroactive to November 10, 2003, instead of the date of the judgment entry.[9] Howard further argues that such an order was prejudicial to him because he had been ordered by the trial court to deposit his entire paycheck in the joint checking account between the months of November 2003 and April 2004 for purposes of paying the marital expenses. Therefore, Howard argues, the final judgment order requires him to pay child and spousal support twice, and has created, through no fault of his own, an immediate support arrearage of $9,825.

{¶ 38} We review matters involving child support under the abuse-of-discretion standard. *Keller v. Keller*, 9th Dist. No. 04CA0084, 2005-Ohio-3302, 2005 WL 1523860, at ¶ 7. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. When applying the abuse-of-discretion standard, this court may not substitute its judgment for that of the trial court. *Pons*, 66 Ohio St.3d at 621, 614 N.E.2d 748.

---

9. We note that the final judgment does not retroactively apply spousal support. The order clearly states that spousal support will begin on the date of the judgment entry.

{¶ 39} It is clear from the record that a temporary order of support was entered by the trial court on December 3, 2002. The order required the parties to conduct their finances as they had prior to the divorce action being filed. Subsequently, Howard was found in contempt for not complying with the temporary order. However, on May 2, 2003, the trial court indicated that Howard could purge himself of contempt by depositing his paycheck into the parties' joint bank account and withholding $50 in cash for Lorinda and $60 in cash for himself. Further, the order stated that Lorinda would continue to pay the marital bills as she had done prior to the divorce action. Finally, the order allowed Lorinda access to the joint credit card to be used for her and the minor daughter's benefit.

{¶ 40} On May 23, 2003, following a hearing, the trial court found that Howard had purged his contempt and ordered that the parties continue to abide by the temporary orders already in place. The trial court indicated in both its May 2 and May 23 orders that the financial framework it had dictated had the intended purpose of inducing both parties into returning to handling the marital finances as they had prior to the divorce being filed. By all accounts, Howard continued to abide by the temporary orders throughout the remainder of the litigation, as evidenced by the lack of further contempt proceedings.

{¶ 41} We begin by noting that Civ.R. 75(N) permits trial courts to enter temporary support orders during the pendency of divorce actions. Civ.R. 75 also provides that the temporary orders may be modified upon written request and after a hearing. The rule does not address retroactivity.

{¶ 42} While we agree that a court has the authority to vacate or modify its own orders during the pendency of an action, such a modification should only be prospective in nature. In *Jackson v. Jackson* (2000), 137 Ohio App.3d 782, 739 N.E.2d 1203, the Second Appellate District addressed whether a court could retroactively modify a temporary order via a final divorce decree:

"[T]he court cannot retroactively modify an obligation it imposed in a prior temporary order, and then award judgment to the obligee based on the obligor's failure to satisfy the modified obligation in the interim. To do so grants a remedy on a claim for relief on which the obligor had no notice or opportunity to be heard. It is well established that prior notice and opportunity to be heard concerning the determination of any matter affecting a party's rights and obligations are essential elements of due process of law."

Id. at 801, 739 N.E.2d 1203, quoting *Drumm v. Drumm* (Mar. 26, 1999), 2d Dist. Nos. 16631 and 17115, 1999 WL 198120.

{¶ 43} In the present case, as in *Jackson*, the trial court did not actually award judgment in a specific amount against Howard. However, the content of the final divorce decree had that effect. See *Jackson* at 801, 739 N.E.2d 1203. Specifical-

ly, the final divorce decree increased the child support and retroactively applied that increase to the period between the start of trial and the final judgment entry, during which time the prior temporary order was in effect. See id. Thus, the final divorce decree effectively created an immediate arrearage of approximately $3,575 awarded to Lorinda for the period of November 10, 2003 to April 13, 2004.[10]

{¶ 44} It is clear to this court that Howard was operating under the trial court's temporary order, and it would be inequitable to penalize him for doing so. The final divorce decree essentially created an obligation on Howard to pay an additional sum of money, after the fact, and then penalized him for not having paid it. By affirming the trial court's retroactive modification of the support award, we would be penalizing Howard for not paying an obligation he was not aware he had. We decline to do so.

{¶ 45} Accordingly, we find that a modification retroactive to a previous temporary order violates due process. When, as here, parties to a divorce operate under a temporary order of support during divorce proceedings without motions to modify being filed and ruled upon, a trial court cannot in effect retroactively modify that order via the final divorce decree.[11] Any modification, downward or upward, may equitably be applied only prospectively from the date of the decree.

{¶ 46} Howard's third assignment of error has merit.

### Assignment of Error Number Four

Whether the trial court erred in determining the amount of income imputed to Mrs. Ostmann and the amount of income attributed to Mr. Ostmann establishing the child support and spousal support.

{¶ 47} In his fourth assignment of error, Howard argues that the trial court erred when it established incomes for Howard and Lorinda for purposes of establishing child and spousal support. Specifically, Howard argues that the trial court overstated Howard's income and understated the income it imputed to Lorinda. We disagree.

---

10. Howard argues that the effective arrearage was $9,825. However, this figure incorrectly includes an arrearage in spousal support for which Howard was not liable. See our discussion in footnote 9. The actual arrearage created by the court's retroactive order is $3,575 ($715 per month in child support multiplied by 5 months).

11. It is clear that if a motion to modify is filed, the support may be modified retroactive to the date of the filing of the motion. *Carr v. Carr* (Aug. 11, 1999), 9th Dist. No. 2880–M, 1999 WL 598837, at 5.

{¶ 48} While this court reviews a child-support determination for an abuse of discretion, attacks on the "factual determinations upon which the [ ] support order is based must be reviewed using the 'some competent credible evidence' standard." *Bender v. Bender* (July 18, 2001), 9th Dist. No. 20157, 2001 WL 808975, at 5. Accordingly, this court will uphold a trial court's determination if there is some competent, credible evidence to support the finding. Id.

### Howard's Income

{¶ 49} Howard argues that he has three sources of income: (1) his standard wage of $18.00 per hour, (2) a distribution bonus, and (3) a rental payment from the country club to the land-holding company. The thrust of Howard's argument is that the trial court erred when it used the average wage from his 2000, 2001, and 2002 federal tax returns to compute his income for support purposes. Howard argues that those figures include an annual bonus. Howard further argues that the trial court ignored his accountant's testimony that Howard would not be receiving a bonus in 2003 and thus inflated his gross income.

{¶ 50} It is clear from the record that Howard's base salary was $37,440.[12] Howard's W-2 statements and federal tax returns indicate that he earned wages of $59,159, $59,546 and $55,186 in 2000, 2001, and 2002 respectively. Therefore, according to the uncontroverted testimony, the overages may be attributed to bonuses based upon the operation of the family golf course. R.C. 3119.01(C)(7) defines gross income as "the total of all earned and unearned income from all sources during a calendar year * * * and includes income from salaries, wages, overtime pay, and bonuses." Therefore, the inclusion of bonuses in gross income for support purposes is proper.

{¶ 51} As stated above, Howard argues that the trial court included his bonuses despite the testimony of his accountant, Charles Paulsen, that the decision had been made in March 2003 that there would be no bonuses for the 2003 fiscal year. Paulsen also testified that he projected no bonuses for the 2004 fiscal year as well. Therefore, Howard argues, pursuant to R.C. 3119.05(D)(2), the trial court was required to calculate in a bonus of zero dollars when determining his gross income.

{¶ 52} When calculating income from bonuses, R.C. 3119.05(D) requires that the trial court include the lesser of (1) the yearly average of all bonuses received during the three years immediately prior to the support calculation and (2) the total bonuses received during the year immediately prior to the support calcula-

---

12. Howard's earning statements indicate that his wage was $18 per hour and he was credited with working 40 hours per week. Based on the average of 2080 hours per year, Howard's salary was $37,440.

tion. See R.C. 3119.05(D)(1) through (2). Howard argues that because it had been determined that he was not going to receive a bonus for fiscal year 2003 in March 2003, which was the end of the fiscal year immediately prior to the support proceeding, subsection (D)(2) should apply and he should be imputed with zero dollars in bonuses.

{¶ 53} However, the statute specifically requires that a parent's income be verified electronically or by suitable documents, including pay stubs and tax returns. R.C. 3119.05(A). See *Fields v. Fields,* 9th Dist. No. 04CA0018–M, 2005-Ohio-471, 2005 WL 293609, at ¶ 18, fn. 2 (noting that in cases in which overtime and bonuses are commonplace, reviewing the parent's tax return is likely the best option when calculating income). Because in November 2003, Howard had not yet filed his personal tax return, the trial court was required by statute to review the tax returns from 2000, 2001, and 2002. Further, Howard's contention that the trial court "ignored" Paulsen's testimony concerning the lack of a 2003 bonus is hyperbole. This court finds that per statute, the trial court was restrained to review documents, not testimony, to establish Howard's income. Accordingly, the trial court reviewed the documents it had available to it— namely, Howard's personal tax returns from 2000, 2001, and 2003.[13]

{¶ 54} Additionally, R.C. 3119.05(H) provides that the trial court may average income over a period of reasonable years when calculating gross income. After a review of the record, this court finds that the trial court used the average earnings from 2000 through 2002 pursuant to Howard's federal tax returns and W-2 statements and thereby implicitly averaged the bonuses included therein for the three years immediately prior to the support being calculated. See R.C. 3119.05(D)(1).

{¶ 55} After a careful review of the record, this court concludes that the trial court adhered to the mandate of R.C. 3119.05 and its judgment was supported by competent, credible evidence.

*Lorinda's Income*

{¶ 56} Howard also argues that the trial court incorrectly imputed income to Lorinda. Howard specifically argues that the trial court's use of Lorinda's hourly wage from 20 years ago inadequately reflects the current job market and that the court failed to consider that Lorinda had not sought employment. Further, Howard proposed that the trial court impute a 33 percent increase in pay to more accurately reflect what Lorinda would earn at the time of the computation.

---

13. We note that nothing in this opinion will preclude Howard from filing a motion to modify support in lieu of his purported change of circumstances.

{¶ 57} Income is imputed to a parent whom the trial court finds to be voluntarily unemployed or voluntarily underemployed. See R.C. 3119.01(C)(11). The record indicates that the trial court found Lorinda to be voluntarily unemployed. The record also indicates that the trial court considered the factors enumerated in R.C. 3119.01(C)(11)(a)(i) through (x). The record reflects that the court considered Lorinda's education and her prior employment history. Lorinda testified that she had a college degree and some minor experience in day care and early education. She testified that her most recent employment was in 1995 as an assistant teacher at the YMCA, earning $7.50 per hour. Further, Howard did not present any evidence regarding Lorinda's earning potential as of 2003. This court finds that competent, credible evidence existed to support the trial court's conclusion that Lorinda had the potential to earn at least a full-time income of $15,600.

{¶ 58} Howard's fourth assignment of error lacks merit.

### III

{¶ 59} Howard's first, second, and third assignments of error are sustained. Howard's fourth assignment of error is overruled. The judgment of the Medina County Domestic Relations Court is affirmed in part and reversed in part, and the cause is remanded for proceedings consistent with this opinion.

Judgment affirmed in part<br>
and reversed in part,<br>
and cause remanded.

SLABY, P.J., and BOYLE, J., concur.