[Cite as *Omar v. Mohamoud*, 2023-Ohio-1548.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Abdirashid Omar, | : | |
| Plaintiff-Appellant, | : | No. 20AP-463 |
| | | (C.P.C. No. 19DR-1623) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Fatumo Mohamoud, | : | |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on May 9, 2023

**On brief:** *Ric Daniell* for appellant. **Argued:** *Ric Daniell.*

**On brief:** *Trolinger Law Offices, LLC*, and *Christopher L. Trolinger* for appellee. **Argued:** *Christopher L. Trolinger.*

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations

MENTEL, J.

{¶ 1} Plaintiff-appellant, Abdirashid Omar, appeals from the judgment entry-decree of divorce entered by the Franklin County Court of Common Pleas, Division of Domestic Relations, ordering him to pay spousal support to defendant-appellee, Fatumo Mohamoud, as well as child support for the benefit of their children. For the following reasons, we affirm the trial court's judgment.

## I. Factual and Procedural Background

{¶ 2} Mr. Omar and Ms. Mohamoud married on July 6, 2010, and had seven children together. (Sept. 16, 2020 Jgmt. Entry at 1.) Mr. Omar moved out of the parties' apartment "in August or September 2018 and has had little contact with the children since then, and no overnights." *Id.* at 2. He filed a complaint for divorce on May 8, 2019, and

Ms. Mohamoud filed an answer and counterclaim also seeking a divorce on June 26, 2019. Claiming that "he has no income," Mr. Omar has not provided Ms. Mohamoud or the children with any support since May of 2020. *Id.* at 3.

{¶ 3} The parties filed several joint stipulations resolving the division of marital assets and agreeing that Ms. Mohamoud's annual income was $18,000, but tried issues of fact concerning spousal support, custody and child support before the trial court on August 3rd and 4th, 2020. After evaluating the parties' testimony and a number of financial documents related to Mr. Omar's businesses, the trial court concluded that his claimed annual income of no more than $31,250 was "ludicrous," and instead determined that it was, at a minimum, $125,000. *Id.* at 23. Citing the discrepancy in the parties' incomes, the trial court awarded Ms. Mohamoud $1,000 in monthly spousal support for a period of 40 months. *Id.* at 20. In addition, the trial court ordered Mr. Omar to pay monthly child support of $2,750 and $179.17 of monthly cash medical support. *Id.* at 25.

## II. Assignments of Error

{¶ 4} Mr. Omar has appealed and assigns the following as error:

> [I.] The lower Court committed an abuse of discretion and erred when it was determined that Appellant's income was $125,000.00 annually.

> [II.] The lower Court committed error when spousal support in the amount of $1,000.00 per month for 40 months was ordered and child support in the amount of $2,750.00 per month was ordered.

## III. Standard of Review

{¶ 5} An appellate court applies an abuse of discretion standard when reviewing a trial court's spousal support and child support orders. *Mayer v. Mayer*, 10th Dist. No. 21AP-3, 2022-Ohio-533, ¶ 15; *Wilkinson v. Wilkinson*, 10th Dist. No. 13AP-73, 2013-Ohio-3627, ¶ 4 (stating that "a trial court is generally afforded wide latitude in deciding spousal support issues"). A trial court abuses its discretion if its ruling is "unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "An unreasonable decision is one that is unsupported by a sound reasoning process." *Lias v.*

*Beekman*, 10th Dist. No. 06AP-1134, 2007-Ohio-5737, ¶ 12, citing *AAAA Ents. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990).

{¶ 6} "Courts of appeals apply the 'some competent, credible evidence' standard to attacks on the factual findings underlying a support order in order to determine whether the trial court abused its discretion in its award of support." *Wood v. Wood*, 10th Dist. No. 10AP-513, 2011-Ohio-679, ¶ 28, citing *Ostmann v. Ostmann*, 168 Ohio App.3d 59, 2006-Ohio-3617, ¶ 48 (9th Dist.). When applying this standard, "reviewing courts give deference to the trial court's factual findings when some competent, credible evidence supporting those findings exists in the record." *Id.*, citing *Myers v. Garson*, 66 Ohio St.3d 610, 614 (1993). "Reviewing courts afford this deference because 'the trial judge is the best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

### A. First Assignment of Error

{¶ 7} In the first assignment of error, Mr. Omar asserts that the trial court erroneously determined that his annual income was $125,000 when calculating spousal support.

{¶ 8} "[S]pousal support" is defined as "any payment or payments to be made to a spouse or former spouse * * * that is both for sustenance and for support of the spouse or former spouse." R.C. 3105.18(A). The trial court is authorized to "award reasonable spousal support to either party." R.C. 3105.18(B). The statute directs the trial court to "consider" 14 enumerated factors when "determining whether spousal support is appropriate and reasonable" in a given case. R.C. 3105.18(C)(1). Mr. Omar's challenge is directed at only one factor: "The income of the parties, from all sources," under R.C. 3105.18(C)(1)(a).

{¶ 9} Although the trial court addressed every R.C. 3105.18(C)(1) factor over 12 pages of its decision, the bulk of its findings addressed Mr. Omar's income. (Jgmt. Entry at 7-19.) According to the trial court, Mr. Omar is "the owner/operator of Universal Transportation," a company that is "the 'go between' of truck drivers and brokers." *Id.* at 8. The trial court explained:

> Universal provides government obligations for the drivers such as certificates of inspection to the brokers, and Universal provides the driver insurance. [Mr. Omar] receives payment from the brokers upon a completed "run" and then pays his independent contractors/drivers through electronic applications such as Zelle, and occasionally in cash. He claims his fee for services is typically 4% of the driver's earnings but can increase to 10% for "full service" which includes booking the load for the driver.

*Id.*

{¶ 10} Records reviewed by the trial court showed that Universal Transportation grossed $445,262 and itemized $443,759 in deductions in 2017, from which Mr. Omar claimed a gross income of $14,950. *Id.* In 2018, the company grossed $848,945 and itemized $846,611 in deductions, and Mr. Omar claimed a gross income of $14,950. *Id.* The trial court also considered evidence presented by Ms. Mohamoud showing that in 2018 "Universal Transportation reported 1099 payments totaling $549,430.22 to individual drivers, compared to traceable payments from [Mr. Omar's] business bank accounts to these drivers in the amount of $409,539, a difference of $139,891.22." *Id.* at 10.

{¶ 11} Mr. Omar had not yet filed the company's 2019 tax return at the time of trial, but the trial court reviewed financial documents and a draft tax return showing that the company had grossed $558,955 and itemized $525,848 in expenses that included payments to drivers and himself. *Id.* at 9. From Mr. Omar's "own bookkeeping," the trial court deduced that Mr. Omar "had access to at least $53,749 of income in 2019," while also noting that the company paid "another business" he possibly owned $114,184. *Id.* According to the trial court, Mr. Omar "admitted that he claims the entire cost of all drivers' insurance and maintenance on Universal Transportation's tax returns, yet also includes the money the company advanced for repairs on the drivers' 1099s even though the drivers do not actually get paid the money [Mr. Omar] paid for their repair expenses." *Id.* Based on the evidence reviewed, the trial court concluded that it was "clear" that the drivers Mr. Omar contracted with were "paying income taxes on business expenses that are used as deductions on IRS forms by Universal Transportation." *Id.* at 11.

{¶ 12} In addition, the trial court reviewed individual bank records by month for Mr. Omar's business. *Id.* at 11-12. It noted that one driver had "made payments totaling $15,000" to Mr. Omar with "no real explanation as to why." *Id.* at 12. The business bank

accounts had "frequent debits for what can only be assumed to be personal expenses," including "restaurants and fast food," clothing stores, Mr. Omar's "personal attorneys fees associated with this case, and more." *Id.* at 13. Furthermore, the trial court noted that Ms. Mohamoud, who "had limited access to the debit cards associated with the business accounts" during the marriage, "testified [that] during this period of high gross income, the parties and their children were receiving food stamps and Medicaid, and that [Mr. Omar] got angry if the food stamps were not sought after." *Id.* at 13-14.

{¶ 13} The trial court also considered evidence that another company "operating similarly to Universal Transportation" purportedly run by Mr. Omar's sister was "actually run" by Mr. Omar. *Id.* at 14. Universal Transportation paid the company $48,118.50 in 2018 and, in the year of the divorce, $114,184. *Id.* The sister was paid $7,986 in 2018 "directly" from Mr. Omar's business and nothing thereafter. *Id.*

{¶ 14} The trial court concluded that Mr. Omar's "testimony regarding business expenses was simply not credible." *Id.* at 15. "The discrepancy in [Mr. Omar's] alleged yearly incomes, compounded by his unreliable accounting methods, significant withdrawals with insufficient tracing, and history of paying for substantial personal expenses out of his business accounts, compel this Court to find he earns *at least* $125,000 annually." (Emphasis sic.) *Id.* The trial court also found Ms. Mohamoud to have "provided credible testimony that the family would spend" five to six thousand dollars a month on living expenses during the marriage, at the same time money was sent to relatives abroad, while at the same time Mr. Omar "hid money so the family was able to receive government assistance for food and health care." *Id.* at 15-16.

{¶ 15} Mr. Omar challenges the trial court's conclusion that he has an annual income of at least $125,000 by arguing that it was logically inconsistent for the trial court to recognize an "over reporting of 1099 forms" without a concurrent loss to the gross income of his business. (Appellant's Brief at 13.) We quote his argument verbatim below rather than risk misrepresenting it through paraphrase:

> The Trial Court did not question the gross income shown on the Appellant's 1120 returns. The deductions shown on the returns also were not closely questioned although some backup documentation for the deductions was introduced (Exhibits G, H, I, J). The question the Appellant raises is based on the findings of the Trial Court concerning the over reporting of

1099 forms. How can Appellant be found to earn $125,000.00 annually, a substantial increase in what Appellant reported on his personal returns, by increasing the overall gross income of the business? As an example, Form 1120 for 2018 shows gross income of $848,945.00 (Exhibit E). Total deductions were $846,611.00. If the amount the Trial Court found was over reported ($138,891.22) is deducted from the gross income ($848,945.00) the gross income for Form 1120 would be $710,053.78, resulting in a loss of $136,557.22. A loss on Form 1120 would be more advantageous to Appellant than the small gain disclosed on the return. Appellant does not gain any advantage for the business by inflating Form 1099s which he distributed to the operators for tax year 2018. Furthermore, the owner-operators would have to willingly consent to the tax liability imposed through an inflated 1099, something the sole third party witness stated that he was not willing to do (Trans. 318).

*Id.* at 13-14.

{¶ 16} Although the trial court did not specifically address the business's Form 1120 tax returns, it was not required to do so to conclude that Mr. Omar had concealed the extent of his income by double counting expenses on those forms as 1) deductions, and 2) including them in the amounts on the 1099s of his drivers.  He asks how the trial court could find that he earned $125,000 a year "by increasing the overall gross income of the business?"  *Id.* at 13.  Mr. Omar answered his own question when he "admitted that he claims the entire cost of all drivers' insurance and maintenance on Universal Transportation's tax returns, yet also includes the money the company advanced for repairs on the drivers' 1099s even though the drivers do not actually get paid the money [Mr. Omar] paid for their repair expenses."  (Jgmt. Entry at 9; *see also id.* at 11 (noting that the drivers were "paying income taxes on business expenses that are used as deductions on IRS forms by Universal Transportation."))  The fact that Mr. Omar did not additionally report an "advantageous" loss on the business's tax return does not illustrate a flaw in the trial court's analysis, as he suggests, only the limits of his own creativity.

{¶ 17} Mr. Omar's real complaint is that the trial court failed "to consider that [he] testified truthfully when he stated that the income tax returns were correct," and that this amounted to an abuse of discretion.  But he himself concedes that "the credibility of witness testimony and the relative weight to be accorded to that testimony is a matter solely within

the province of the trier of fact." (Appellant's Brief at 11, 15, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77 (1984).) Witnesses routinely testify about financial matters in R.C. 3105.18 support actions and appellate courts defer to the trial court's credibility determination. *See Eckstein v. Eckstein*, 9th Dist. No. 03CA0048-M, 2004-Ohio-724, ¶ 11 (noting that although appellant testified "as to his current financial situation," the trial court "did not find appellant's testimony credible" and upholding trial court's determination that appellant had $100,000 annual income when calculating child support); *Burns v. Burns*, 12th Dist. No. CA2011-05-050, 2012-Ohio-2850, ¶ 19-20 (affirming trial court's determination that appellant's assertions regarding his income not "to be credible," based in part on "suspicious behavior" including appellant's contention "that he repaid the company for $15,000 in legal fees, yet only a $10,000 check was introduced as evidence, and even then the check was made payable to another officer of the company rather than the company itself"). Here, the trial court did not fail to consider whether Mr. Omar testified truthfully. To the contrary, as the trial court's careful consideration of the issue is a theme repeatedly emphasized in its decision. The trial court disbelieved much of his testimony, repeatedly noted his lack of credibility, and credited the testimony of Ms. Mohamoud. As Mr. Omar concedes, this determination fit squarely within the scope of the trial court. Because he has failed to demonstrate that a lack of competent, credible evidence supported the court's findings, he cannot demonstrate an abuse of discretion when determining his income under R.C. 3105.18(C)(1)(a). Accordingly, the first assignment of error is overruled.

### B. Second Assignment of Error

{¶ 18} In the second assignment of error, Mr. Omar challenges the trial court's spousal support of $1,000 for 40 months, as well as its $2,750 monthly child support order. He "believes" that the trial court's decision finding that he has an annual income of $125,000 "was reached through the imputation of income." (Appellant's Brief at 17.) He again questions the trial court's reasoning when arriving at this figure, arguing that the trial court improperly evaluated his testimony before determining his annual income. *Id.* at 18.

{¶ 19} First, Mr. Omar is incorrect when asserting that the trial court imputed income to him. "Because R.C. 3105.18(C) permits inquiry into a party's earning potential, Ohio courts often impute income to parties who are voluntarily underemployed or

otherwise not working up to their full earning potential." *Havanec v. Havanec*, 10th Dist. No. 08AP-465, 2008-Ohio-6966, ¶ 9. Here, the trial court did not find that Mr. Omar was voluntarily underemployed or that he was failing to work up to his full potential. There is no question that Mr. Omar possesses an industrious work ethic. The trial court found as matter of fact that Mr. Omar earned at least $125,000 a year, not that he could have earned such an amount but for underemployment or lack of effort.

{¶ 20} Second, Mr. Omar's arguments concerning the trial court's evaluation of his testimony and the financial documents examined repeats the arguments made in his first assignment of error. He again attempts to challenge the trial court's finding under R.C. 3105.18(C)(1)(a) concerning his income but provides no novel basis for discerning error.

{¶ 21} Finally, we note that although the second assignment of error purports to challenge the trial court's spousal and child support awards, it provides no argument explaining how the amounts arrived at by the trial court for those awards was in error. For the foregoing reasons, the second assignment of error is overruled.

## IV. Conclusion

{¶ 22} Having overruled Mr. Omar's first and second assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations.

*Judgment affirmed.*

BEATTY BLUNT, P.J., concurs.
DORRIAN, J., concurs in judgment only.

_____